# UNITED STATES *v.* SILK, DOING BUSINESS AS ALBERT SILK COAL CO.

NO. 312.

Argued March 10, 1947.—Decided June 16, 1947.

*Robert L. Stern* argued the cause for petitioners. With him on the briefs were *Acting Solicitor General Washington, Sewall Key* and *Lyle M. Turner. Jack B. Tate* was also with them on the brief in No. 312.

*Ralph F. Glenn* argued the cause for respondent in No. 312. With him on the brief were *Robert Stone* and *Warren W. Shaw.*

*Wilbur E. Benoy* argued the cause for respondent in No. 673. With him on the brief were *Arthur M. Sebastian* and *Robert Driscoll.*

MR. JUSTICE REED delivered the opinion of the Court.

We consider together the above two cases. Both involve suits to recover sums exacted from businesses by the Commissioner of Internal Revenue as employment taxes on employers under the Social Security Act.[1] In both instances the taxes were collected on assessments made administratively by the Commissioner because he concluded the persons here involved were employees of the taxpayers. Both cases turn on a determination as to whether the workers involved were employees under that Act or whether they were independent contractors. Writs of certiorari were granted, 329 U. S. 702 and 329 U. S. 709, because of the general importance in the collection of social security taxes of deciding what are the applicable standards for the determination of employees under the Act. Varying standards have been applied in the federal courts.[2]

---

[1] Titles VIII and IX, Social Security Act, 49 Stat. 636 and 639, as repealed in part 53 Stat. 1.

See Internal Revenue Code, chap. 9, subchap. A and C.

[2] *Texas Co.* v. *Higgins*, 118 F. 2d 636; *Jones* v. *Goodson*, 121 F. 2d 176; *Deecy Products Co.* v. *Welch*, 124 F. 2d 592; *American Oil Co.* v. *Fly*, 135 F. 2d 491; *Glenn* v. *Beard*, 141 F. 2d 376; *Magruder* v. *Yellow*

Respondent in No. 312, Albert Silk, doing business as the Albert Silk Coal Co., sued the United States, petitioner, to recover taxes alleged to have been illegally assessed and collected from respondent for the years 1936 through 1939 under the Social Security Act. The taxes were levied on respondent as an employer of certain workmen some of whom were engaged in unloading railway coal cars and the others in making retail deliveries of coal by truck.

Respondent sells coal at retail in the city of Topeka, Kansas. His coalyard consists of two buildings, one for an office and the other a gathering place for workers, railroad tracks upon which carloads of coal are delivered by the railroad, and bins for the different types of coal. Respondent pays those who work as unloaders an agreed price per ton to unload coal from the railroad cars. These men come to the yard when and as they please and are assigned a car to unload and a place to put the coal. They furnish their own tools, work when they wish and work for others at will. One of these unloaders testified that he worked as regularly "as a man has to when he has to eat" but there was also testimony that some of the unloaders were floaters who came to the yard only intermittently.

Respondent owns no trucks himself but contracts with workers who own their own trucks to deliver coal at a uniform price per ton. This is paid to the trucker by the respondent out of the price he receives for the coal from the customer. When an order for coal is taken in the company office, a bell is rung which rings in the building used by the truckers. The truckers have voluntarily

*Cab Co.,* 141 F. 2d 324; *United States* v. *Mutual Trucking Co.,* 141 F. 2d 655; *Glenn* v. *Standard Oil Co.,* 148 F. 2d 51, 53; *McGowan* v. *Lazeroff,* 148 F. 2d 512; *United States* v. *Wholesale Oil Co.,* 154 F. 2d 745; *United States* v. *Vogue, Inc.,* 145 F. 2d 609, 612; *United States* v. *Aberdeen Aerie No. 24,* 148 F. 2d 655, 658; *Grace* v. *Magruder,* 148 F. 2d 679, 680–81; *Nevins, Inc.* v. *Rothensies,* 151 F. 2d 189.

adopted a call list upon which their names come up in turn, and the top man on the list has an opportunity to deliver the coal ordered. The truckers are not instructed how to do their jobs, but are merely given a ticket telling them where the coal is to be delivered and whether the charge is to be collected or not. Any damage caused by them is paid for by the company. The District Court found that the truckers could and often did refuse to make a delivery without penalty. Further, the court found that the truckers may come and go as they please and frequently did leave the premises without permission. They may and did haul for others when they pleased. They pay all the expenses of operating their trucks, and furnish extra help necessary to the delivery of the coal and all equipment except the yard storage bins. No record is kept of their time. They are paid after each trip, at the end of the day or at the end of the week, as they request.

The Collector ruled that the unloaders and truckers were employees of the respondent during the years 1936 through 1939 within the meaning of the Social Security Act and he accordingly assessed additional taxes under Titles VIII and IX of the Social Security Act and Sub-chapters A and C of Chapter 9 of the Internal Revenue Code. Respondent filed a claim for a refund which was denied. He then brought this action. Both the District Court and the Circuit Court of Appeals [3] thought that the truckers and unloaders were independent contractors and allowed the recovery.

Respondent in No. 673, Greyvan Lines, Inc., a common carrier by motor truck, sued the petitioner, a Collector of Internal Revenue, to recover employment taxes alleged to have been illegally assessed and collected from it under similar provisions of the Social Security Act involved in

---

[3] 155 F. 2d 356.

Silk's case for the years or parts of years 1937 through the first quarter of 1942. From a holding for the respondent in the District Court petitioner appealed. The Circuit Court of Appeals affirmed. The chief question in this case is whether truckmen who perform the actual service of carrying the goods shipped by the public are employees of the respondent. Both the District Court and the Circuit Court of Appeals [4] thought that the truckmen were independent contractors.

The respondent operates its trucking business under a permit issued by the Interstate Commerce Commission under the "grandfather clause" of the Motor Carrier Act. 32 M. C. C. 719, 723. It operates throughout thirty-eight states and parts of Canada, carrying largely household furniture. While its principal office is in Chicago, it maintains agencies to solicit business in many of the larger cities of the areas it serves, from which it contracts to move goods. As early as 1930, before the passage of the Social Security Act, the respondent adopted the system of relations with the truckmen here concerned, which gives rise to the present issue. The system was based on contracts with the truckmen under which the truckmen were required to haul exclusively for the respondent and to furnish their own trucks and all equipment and labor necessary to pick up, handle and deliver shipments, to pay all expenses of operation, to furnish all fire, theft, and collision insurance which the respondent might specify, to pay for all loss or damage to shipments and to indemnify the company for any loss caused it by the acts of the truckmen, their servants and employees, to paint the designation "Greyvan Lines" on their trucks, to collect all money due the company from shippers or consignees, and to turn in such moneys at the office to which they report after delivering a shipment, to post bonds with the

[4] 156 F. 2d 412.

company in the amount of $1,000 and cash deposits of $250 pending final settlement of accounts, to personally drive their trucks at all times or be present on the truck when a competent relief driver was driving (except in emergencies, when a substitute might be employed with the approval of the company), and to follow all rules, regulations, and instructions of the company. All contracts or bills of lading for the shipment of goods were to be between the respondent and the shipper. The company's instructions covered directions to the truckmen as to where and when to load freight. If freight was tendered the truckmen, they were under obligation to notify the company so that it could complete the contract for shipment in its own name. As remuneration, the truckmen were to receive from the company a percentage of the tariff charged by the company varying between 50 and 52% and a bonus up to 3% for satisfactory performance of the service. The contract was terminable at any time by either party. These truckmen were required to take a short course of instruction in the company's methods of doing business before carrying out their contractual obligations to haul. The company maintained a staff of dispatchers who issued orders for the truckmen's movements, although not the routes to be used, and to which the truckmen, at intervals, reported their positions. Cargo insurance was carried by the company. All permits, certificates and franchises "necessary to the operation of the vehicle in the service of the Company as a motor carrier under any Federal or State Law" were to be obtained at the company's expense.

The record shows the following additional undisputed facts, not contained in the findings. A manual of instructions, given by the respondent to the truckmen, and a contract between the company and Local No. 711 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America were introduced in evi-

dence. It suffices to say that the manual purported to regulate in detail the conduct of the truckmen in the performance of their duties, and that the agreement with the Union provided that any truckman must first be a member of the union, and that grievances would be referred to representatives of the company and the union. A company official testified that the manual was impractical and that no attempt was made to enforce it. We understand the union contract was in effect. The company had some trucks driven by truckmen who were admittedly company employees. Operations by the company under the two systems were carried out in the same manner. The insurance required by the company was carried under a blanket company policy for which the truckmen were charged proportionately.

The Social Security Act of 1935 was the result of long consideration by the President and Congress of the evil of the burdens that rest upon large numbers of our people because of the insecurities of modern life, particularly old age and unemployment. It was enacted in an effort to coordinate the forces of government and industry for solving the problems.[5] The principal method adopted by Congress to advance its purposes was to provide for periodic payments in the nature of annuities to the elderly and compensation to workers during periods of unemployment. Employment taxes, such as we are here considering, are necessary to produce the revenue for federal participation in the program of alleviation. Employers do not pay taxes on certain groups of employees, such as agricultural or domestic workers

---

[5] Message of the President, January 17, 1935, and Report of the Committee on Economic Security, H. Doc. No. 81, 74th Cong., 1st Sess.; S. Rep. No. 628, 74th Cong., 1st Sess.; S. Rep. No. 734, 76th Cong., 1st Sess.; H. Rep. No. 615, 74th Cong., 1st Sess.; H. Rep. No. 728, 76th Cong., 1st Sess. *Steward Machine Co.* v. *Davis*, 301 U. S. 548; *Helvering* v. *Davis*, 301 U. S. 619.

but none of these exceptions are applicable to these cases. §§ 811 and 907. Taxes are laid as excises on a percentage of wages paid the nonexempt employees. §§ 804 and 901; I. R. C. §§ 1410, 1600. "Wages" means all remuneration for the employment that is covered by the Act, cash or otherwise. §§ 811, 907; I. R. C. §§ 1426, 1607 (b). "Employment" means "any service, of whatever nature, performed . . . by an employee for his employer, except . . . Agricultural labor" *et cetera.* §§ 811 (b), 907 (c); I. R. C. §§ 1426 (b), 1607 (c). As a corollary to the coverage of employees whose wages are the basis for the employment taxes under the tax sections of the social security legislation, rights to benefit payments under federal old age insurance depend upon the receipt of wages as employees under the same sections. 53 Stat. 1360, §§ 202, 209 (a), (b), (g), 205 (c) (1). See *Social Security Board* v. *Nierotko,* 327 U. S. 358. This relationship between the tax sections and the benefit sections emphasizes the underlying purpose of the legislation—the protection of its beneficiaries from some of the hardships of existence. *Helvering* v. *Davis, supra,* 640. No definition of employer or employee applicable to these cases occurs in the Act. See § 907 (a) and I. R. C. § 1607 (a). Compare, as to carrier employment, I. R. C. § 1532 (d), as amended by 60 Stat. 722, § 1. Nothing that is helpful in determining the scope of the coverage of the tax sections of the Social Security Act has come to our attention in the legislative history of the passage of the Act or amendments thereto.

Since Congress has made clear by its many exemptions, such as, for example, the broad categories of agricultural labor and domestic service, 53 Stat. 1384, 1393, that it was not its purpose to make the Act cover the whole field of service to every business enterprise, the sections in question are to be read with the exemptions in mind. The very specificity of the exemptions, however, and the gen-

erality of the employment definitions [6] indicates that the terms "employment" and "employee," are to be construed to accomplish the purposes of the legislation. As the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose. Such an interpretation would only make for a continuance, to a considerable degree, of the difficulties for which the remedy was devised and would invite adroit schemes by some employers and employees to avoid the immediate burdens at the expense of the benefits sought by the legislation.[7] These considerations have heretofore guided our construction of the Act. *Buckstaff Bath House Co.* v. *McKinley,* 308 U. S. 358; *Social Security Board* v. *Nierotko,* 327 U. S. 358.

Of course, this does not mean that all who render service to an industry are employees. Compare *Metcalf & Eddy* v. *Mitchell,* 269 U. S. 514, 520. Obviously the private contractor who undertakes to build at a fixed price or on cost-plus a new plant on specifications is not an employee of the industry thus served nor are his employees. The distributor who undertakes to market at his own risk the product of another, or the producer who agrees so to manufacture for another, ordinarily cannot be said to have the employer-employee relationship. Production and distribution are different segments of business. The purposes of the legislation are not frustrated because the Govern-

---

[6] See 53 Stat. 1384, 1393, "The term 'employment' means any service performed prior to January 1, 1940, which was employment as defined in this section prior to such date, and any service, of whatever nature, performed after December 31, 1939, within the United States by an employee for the person employing him, irrespective of the citizenship or residence of either, except— . . . ." Compare 49 Stat. 639 and 643.

[7] Nothing to suggest tax avoidance appears in these records.

ment collects employment taxes from the distributor instead of the producer or the other way around.

The problem of differentiating between employee and an independent contractor, or between an agent and an independent contractor, has given difficulty through the years before social legislation multiplied its importance. When the matter arose in the administration of the National Labor Relations Act, we pointed out that the legal standards to fix responsibility for acts of servants, employees or agents had not been reduced to such certainty that it could be said there was "some simple, uniform and easily applicable test." The word "employee," we said, was not there used as a word of art, and its content in its context was a federal problem to be construed "in the light of the mischief to be corrected and the end to be attained." We concluded that, since that end was the elimination of labor disputes and industrial strife, "employees" included workers who were such as a matter of economic reality. The aim of the Act was to remedy the inequality of bargaining power in controversies over wages, hours and working conditions. We rejected the test of the "technical concepts pertinent to an employer's legal responsibility to third persons for acts of his servants." This is often referred to as power of control, whether exercised or not, over the manner of performing service to the industry. Restatement of the Law, Agency, § 220. We approved the statement of the National Labor Relations Board that "the primary consideration in the determination of the applicability of the statutory definition is whether effectuation of the declared policy and purposes of the Act comprehend securing to the individual the rights guaranteed and protection afforded by the Act." *Labor Board* v. *Hearst Publications,* 322 U. S. 111, 120, 123, 124, 128, 129, 131.

Application of the social security legislation should follow the same rule that we applied to the National Labor

Relations Act in the *Hearst* case. This, of course, does not leave courts free to determine the employer-employee relationship without regard to the provisions of the Act. The taxpayer must be an "employer" and the man who receives wages an "employee." There is no indication that Congress intended to change normal business relationships through which one business organization obtained the services of another to perform a portion of production or distribution. Few businesses are so completely integrated that they can themselves produce the raw material, manufacture and distribute the finished product to the ultimate consumer without assistance from independent contractors. The Social Security Act was drawn with this industrial situation as a part of the surroundings in which it was to be enforced. Where a part of an industrial process is in the hands of independent contractors, they are the ones who should pay the social security taxes.

The long-standing regulations of the Treasury and the Federal Security Agency (H. Doc. 595, 79th Cong., 2d Sess.) recognize that independent contractors exist under the Act. The pertinent portions are set out in the margin.[8] Certainly the industry's right to control how "work shall be done" is a factor in the determination of whether the worker is an employee or independent contractor.

---

[8] Treasury Regulations 90, promulgated under Title IX of the Social Security Act, Art. 205:

"Generally the relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to *what* shall be done but *how* it shall be done. . . . The right to discharge is also an important factor indicating that the person possessing that right is an employer. Other factors characteristic of an employer are the furnishing of tools and the furnishing of a place to work, to the individual who performs the services. In general, if an individual is subject to the control or direc-

The Government points out that the regulations were construed by the Commissioner of Internal Revenue to cover the circumstances here presented. This is shown by his additional tax assessments. Other instances of such administrative determinations are called to our attention.[9]

So far as the regulations refer to the effect of contracts, we think their statement of the law cannot be challenged successfully. Contracts, however "skilfully devised," *Lucas* v. *Earl,* 281 U. S. 111, 115, should not be permitted to shift tax liability as definitely fixed by the statutes.[10]

---

tion of another merely as to the result to be accomplished by the work and not as to the means and methods for accomplishing the result, he is an independent contractor, not an employee.

"If the relationship of employer and employee exists, the designation or description of the relationship by the parties as anything other than that of employer and employee is immaterial. Thus, if two individuals in fact stand in the relation of employer and employee to each other, it is of no consequence that the employee is designated as a partner, coadventurer, agent, or independent contractor.

"The measurement, method, or designation of compensation is also immaterial, if the relationship of employer and employee in fact exists.

"Individuals performing services as independent contractors are not employees. Generally, physicians, lawyers, dentists, veterinarians, contractors, subcontractors, public stenographers, auctioneers, and others who follow an independent trade, business, or profession, in which they offer their services to the public, are independent contractors and not employees." 26 C. F. R. § 400.205. See also Treasury Regulations 91, 26 C. F. R. § 401.3. (Emphasis added.)

[9] The citation of these cases does not imply approval or disapproval of the results. The cases do show the construction of the regulation by the agency. *United States* v. *Mutual Trucking Co.,* 141 F. 2d 655; *Jones* v. *Goodson,* 121 F. 2d 176; *Magruder* v. *Yellow Cab Co.,* 141 F. 2d 324; *Texas Co.* v. *Higgins,* 118 F. 2d 636; *American Oil Co.* v. *Fly,* 135 F. 2d 491; *Glenn* v. *Standard Oil Co.,* 148 F. 2d 51.

See also note 2.

[10] *Gregory* v. *Helvering,* 293 U. S. 465; *Griffiths* v. *Commissioner,* 308 U. S. 355; *Higgins* v. *Smith,* 308 U. S. 473; *Helvering* v. *Clifford,* 309 U. S. 331.

716

Probably it is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship. The Social Security Agency and the courts will find that degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation are important for decision. No one is controlling nor is the list complete. These unloaders and truckers and their assistants are from one standpoint an integral part of the businesses of retailing coal or transporting freight. Their energy, care and judgment may conserve their equipment or increase their earnings but Greyvan and Silk are the directors of their businesses. On the other hand, the truckmen hire their own assistants, own their trucks, pay their own expenses, with minor exceptions, and depend upon their own initiative, judgment and energy for a large part of their success.

Both lower courts in both cases have determined that these workers are independent contractors. These inferences were drawn by the courts from facts concerning which there is no real dispute. The excerpts from the opinions below show the reasons for their conclusions.[11]

Giving full consideration to the concurrence of the two lower courts in a contrary result, we cannot agree that the

---

[11] *United States* v. *Silk,* 155 F. 2d 356, 358–9: "But even while they work for appellee they are not subject to his control as to the method or manner in which they are to do their work. The undisputed evidence is that the only supervision or control ever exercised or that could be exercised over the haulers was to give them the sales ticket if they were willing to take it, and let them deliver the coal. They were free to choose any route in going to or returning. They were not required even to take the coal for delivery.

"We think that the relationship between appellee and the unloaders is not materially different from that between him and the haulers. In response to a question on cross examination, appellee did testify that the unloaders did what his superintendent at the coal yard told them to do, but when considered in the light of all his testimony, all that

unloaders in the *Silk* case were independent contractors.[12] They provided only picks and shovels. They had no opportunity to gain or lose except from the work of their

this answer meant that they unloaded the car assigned to them into the designated bin. . . .

"The undisputed facts fail to establish such reasonable measure of direction and control over the method and means of performing the services performed by these workers as is necessary to establish a legal relationship of employer and employee between appellee and the workers in question."

*Greyvan Lines* v. *Harrison*, 156 F. 2d 412, 414–16. After stating the trial court's finding that the truckmen were not employees, the appellate court noted:

"Appellant contends that in determining these facts the court failed to give effect to important provisions of the contracts which it asserts clearly show the reservation of the right of control over the truckmen and their helpers as to the methods and means of their operations which, it is agreed, furnish the test for determining the relationship here in question. . . ."

It then discussed the manual and concluded:

"While it is true that many provisions of the manual, if strictly enforced, would go far to establish an employer-employee relationship between the Company and its truckmen, we agree with appellee that there was evidence to justify the court's disregarding of it. It was not prepared until April, 1940, although the tax period involved was from November, 1937, through March, 1942, and there was no evidence to show any change or tightening of controls after its adoption and distribution; one driver testified that he was never instructed to follow the rules therein provided; an officer of the Company testified that it had been prepared by a group of three men no longer in their employ, and that it had been impractical and was not adhered to."

After a discussion of the helper problem, this statement appears: ". . . the Company cannot be held liable for employment taxes on the wages of persons over whom it exerts no control, and of whose employment it has no knowledge. And this element of control of the truckmen over their own helpers goes far to prevent the employer-employee relationship from arising between them and the Company. While many factors in this case indicate such control as to give rise to that relationship, we think the most vital one is missing because of the complete control of the truckmen as to how many, if any, and what helpers they make use of in their operations. . . ."

[12] Cf. *Grace* v. *Magruder*, 148 F. 2d 679.

hands and these simple tools. That the unloaders did not work regularly is not significant. They did work in the course of the employer's trade or business. This brings them under the coverage of the Act.[13] They are of the group that the Social Security Act was intended to aid. Silk was in a position to exercise all necessary supervision over their simple tasks. Unloaders have often been held to be employees in tort cases.[14]

There are cases, too, where driver-owners of trucks or wagons have been held employees [15] in accident suits at

[13] I. R. C., chap. 9, subchap. A, § 1426 (b), as amended, 53 Stat. 1384:

"The term 'employment' means any service performed . . . by an employee for the person employing him . . . except—

.      .      .      .

"(3) Casual labor not in the course of the employer's trade or business; . . ."

[14] *Swift & Co.* v. *Alston*, 48 Ga. App. 649, 173 S. E. 741; *Holmes* v. *Tennessee Coal, I. & R. Co.*, 49 La. Ann. 1465, 22 So. 403; *Muncie Foundry Co.* v. *Thompson*, 70 Ind. App. 157, 123 N. E. 196; *Chicago, R. I. & P. R. Co.* v. *Bennett*, 36 Okla. 358, 128 P. 705; *Murray's Case*, 130 Me. 181, 154 A. 352; *Decatur R. Co.* v. *Industrial Board*, 276 Ill. 472, 114 N. E. 915; *Benjamin* v. *Fertilizer Co.*, 169 Miss. 162, 152 So. 839.

[15] *Western Express Co.* v. *Smeltzer*, 88 F. 2d 94; *Industrial Commission* v. *Bonfils*, 78 Colo. 306, 241 P. 735; *Coppes Bros. & Zook* v. *Pontius*, 76 Ind. App. 298, 131 N. E. 845; *Burruss* v. *B. M. C. Logging Co.*, 38 N. M. 254, 31 P. 2d 263; *Bradley* v. *Republic Creosoting Co.*, 281 Mich. 177, 274 N. W. 754; *Rouse* v. *Town of Bird Island*, 169 Minn. 367, 211 N. W. 327; *Industrial Commission* v. *Hammond*, 77 Colo. 414, 236 P. 1006; *Kirk* v. *Lime Co. & Insurance Co.*, 137 Me. 73, 15 A. 2d 184; *Showers* v. *Lund*, 123 Neb. 56, 242 N. W. 258; *Burt* v. *Davis-Wood Lumber Co.*, 157 La. 111, 102 So. 87; *Dunn* v. *Reeves Coal Yards Co., Inc.*, 150 Minn. 282, 184 N. W. 1027; *Waters* v. *Pioneer Fuel Co.*, 52 Minn. 474, 55 N. W. 52; *Warner* v. *Hardwood Lumber Co.*, 231 Mich. 328, 204 N. W. 107; *Frost* v. *Blue Ridge Timber Corp.*, 158 Tenn. 18, 11 S. W. 2d 860; *Lee* v. *Mark H. Brown Lumber Co.*, 15 La. App. 294, 131 So. 697.

See particularly *Singer Manufacturing Co.* v. *Rahn*, 132 U. S. 518.

tort or under workmen's compensation laws. But we agree with the decisions below in *Silk* and *Greyvan* that where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors.[16] These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.

No. 312, *United States* v. *Silk,* is affirmed in part and reversed in part.

No. 673, *Harrison* v. *Greyvan Lines, Inc.,* is affirmed.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE MURPHY are of the view that the applicable principles of law, stated by the Court and with which they agree, require reversal of both judgments in their entirety.

MR. JUSTICE RUTLEDGE.

I join in the Court's opinion and in the result insofar as the principles stated are applied to the unloaders in the *Silk* case. But I think a different disposition should be made in application of those principles to the truckers in that case and in the *Greyvan* case.

So far as the truckers are concerned, both are borderline cases.[1] That would be true, I think, even if the so-

---

[16] Compare *United States* v. *Mutual Trucking Co.,* 141 F. 2d 655; *Glenn* v. *Standard Oil Co.,* 148 F. 2d 51.

[1] The opinion of the Circuit Court of Appeals in the *Greyvan* case stated, after referring to *United States* v. *Mutual Trucking Co.,* 141 F. 2d 655: "It is true that the facts there do not present as close a question as in the case at bar." And see note 3.

called "common law control" test were conclusive,[2] as the District Court and the Circuit Court of Appeals in each case seem to have regarded it.[3]  It is even more true under

[2] It is not at all certain that either Silk or Greyvan Lines would not be held liable in tort, under application of the common law test, for injuries negligently inflicted upon persons or property of others by their truckers, respectively, in the course of operating the trucks in connection with their businesses.  Indeed this result would seem to be clearly indicated, in the case of Greyvan particularly, in view of the fact that the trucks bore its name, in addition to other factors including a large degree of control exercised over the trucking operations.  For federal cases in point see *Silent Automatic Sales Corp.* v. *Stayton,* 45 F. 2d 471 (applying Missouri law) ; *Falstaff Brewing Corp.* v. *Thompson,* 101 F. 2d 301 (applying Nebraska law) ; *Young* v. *Wilky Carrier Corp.,* 54 F. Supp. 912, aff'd, 150 F. 2d 764 (applying Pennsylvania law).  And see for a general collection of state cases, 9 Blashfield, Cyclopedia of Automobile Law and Practice (1941) § 6056.

Certainly the question of coverage under the statute, as an employee, should not be determined more narrowly than that of employee status for purposes of imposing vicarious liability in tort upon an employer, whether by application of the control test exclusively or of the Court's broader ruling.

[3] In the *Silk* case formal findings of fact and conclusions of law by the District Court do not appear in the record.  But a "Statement by the Court" recites details of the arrangements with the truckers and unloaders in the focus of whether Silk exercised control over them and concludes he did not; hence, there was no employer-employee relation.  The opinion of the Circuit Court of Appeals, though recognizing the necessity for liberal construction of the Act, treats the facts found in the same focus of control.  The court was influenced by the regulations promulgated under the Act (Reg. 90, Art. 205) and also by the Bureau of Internal Revenue (Reg. 91, Art. 3).  The opinion concludes: "The undisputed facts fail to establish such reasonable measure of direction and control over the method and means of performing the services . . . as is necessary" to create the employer-employee relation.  155 F. 2d 356, 359.

In the *Greyvan* case formal findings and conclusions were filed. The Circuit Court of Appeals, accepting the findings, concluded they did not show "change or tightening of controls" after the company's adoption of a manual in 1940, although its provisions "if strictly en-

the broader and more factual approach the Court holds should be applied.

I agree with the Court's views in adopting this approach and that the balance in close cases should be cast in favor of rather than against coverage, in order to fulfill the statute's broad and beneficent objects. A narrow, constricted construction in doubtful cases only goes, as indeed the opinion recognizes, to defeat the Act's policy and purposes *pro tanto*.

But I do not think it necessary or perhaps in harmony with sound practice, considering the nature of this Court's functions and those of the district courts, for us to undertake drawing the final conclusion generally in these borderline cases. Having declared the applicable principles of law to be applied, our function is sufficiently discharged by seeing to it that they are observed. And when this has been done, drawing the final conclusion, in matters so largely factual as the end result must be in close cases, is more properly the business of the district courts than ours.

Here the District Courts and the Circuit Courts of Appeals determined the cases largely if not indeed exclusively by applying the so-called "common law control" test as the criterion. This was clearly wrong, in view of the Court's present ruling. But for its action in drawing the ultimate and largely factual conclusion on that basis, the error would require remanding the causes to the District

---

forced, would go far to establish an employer-employee relationship . . . ." 156 F. 2d 412, 415. However, it found another factor conclusive: "While many factors in this case indicate such control as to give rise to that relationship, we think the most vital one is missing because of the complete control of the truckmen as to how many, if any, and what helpers they make use of in their operations." 156 F. 2d at 416. Apparently not control of the method of performing the work in general but absence of expressly reserved right of control in a single feature became the criterion used.

Courts in order for them to exercise that function in the light of the present decision.

I would follow that course, so far as the truckers are concerned.