**WEATHERGUARD CORPORATION**

v.

**The UNITED STATES.**

**No. 113-54.**

United States Court of Claims.

Jan. 16, 1957.

Joseph J. Lyman, Washington, D. C., for plaintiff.

Gilbert E. Andrews, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. Andrew D. Sharpe, Washington, D. C., was on the brief.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

JONES, Chief Judge.

This is a suit to recover federal insurance contributions taxes and federal unemployment taxes which plaintiff taxpayer asserts were erroneously collected for the years 1947 through 1951.

Pursuant to Rule 38(c), 28 U.S.C., the immediate issue is limited to the question of plaintiff's right to recover all or any part of such taxes as to certain full-time commission salesmen. The parties have agreed that whatever decision is made by the court relative to the full-time salesmen shall be applicable and binding as to part-time salesmen.

During the time material to the issues involved the plaintiff operated a factory at Philadelphia for the fabrication of metal storm sashes and doors. The distribution of products was handled by plaintiff through two divisions. It had a wholesale division which supplied about 50 accounts from New York to Virginia. It also maintained a retail division which it operated through offices in four cities for the distribution of such products. These offices were located in Philadelphia, Washington, Baltimore, and Trenton.

The issue to be determined is whether plaintiff's salesmen were employees of the plaintiff within the meaning of 26 U.S.C. (1946 Ed., Supp. II) §§ 1426(d) and 1607(i).

These identical sections are as follows:

> "*Employee.* The term 'employee' includes an officer of a corporation, but such term does not include (1) any individual who, under the usual common-law rules applicable in determining the employer-employee relationship, has the status of an independent contractor or (2) any individual (except an officer of a corporation) who is not an employee under such common-law rules."

The kind of work these salesmen performed and the circumstances and conditions in which they operated are set out in detail in the court's findings 3 to 21, inclusive.

The decisions by the various courts concerning whether an employer-employee relationship exists are in agreement that no special rule of thumb can be applied in all cases. The result in each case must be governed by the special facts and circumstances of the case itself.

A full discussion of the principles involved, and the method of construction to be used in applying the federal social security legislation is found in the case

of United States v. Silk, 331 U.S. 704, 67 S.Ct. 1463, 1467, 91 L.Ed. 1757. In that case, in discussing the question of whether unloaders of coal and truck drivers who owned their own trucks were employees under the provisions of the Social Security Act of 1935, 42 U.S.C.A. § 301 et seq., the Court placed particular emphasis upon the problems the President and Congress were seeking to solve, and the necessity for raising funds with which to accomplish the purposes for which the legislation was enacted. It indicated that the statute was intended to cover all cases of employment other than the ones that were specifically exempted; such as agricultural labor and domestic services. It declared that these specific exemptions and the generality of the employment definitions indicated that the terms "employment" and "employee" were to be construed to accomplish the purposes of the legislation. It emphasized that since "the federal social security legislation is an attack on recognized evils in our national economy, a constricted interpretation of the phrasing by the courts would not comport with its purpose."

We quote from the opinion in the Silk case, 331 U.S. at page 716, 67 S.Ct. at page 1470:

> "Giving full consideration to the concurrence of the two lower courts in a contrary result, we cannot agree that the unloaders in the Silk case were independent contractors. They provided only picks and shovels. They had no opportunity to gain or lose except from the work of their hands and these simple tools. That the unloaders did not work regularly is not significant. They did work in the course of the employer's trade or business. This brings them under the coverage of the Act. They are of the group that the Social Security Act was intended to aid. Silk was in a position to exercise all necessary supervision over their simple tasks. Unloaders have often been held to be employees in tort cases."

Applying the principles laid down in the Silk case, and other decisions by the Supreme Court and other courts, the single issue presented in this case is whether or not the salesmen who sold plaintiff's products were employees of the plaintiff under the statute involved. In order to resolve this issue it is necessary to consider all of the facts before the court.

While the case is not without some difficulties when we consider the facts in connection with the broad purposes of the social security legislation as laid down in the Silk case, supra, we have reached the conclusion that these full-time commission salesmen were employees of plaintiff within the meaning of 26 U.S.C. (1946 Ed., Supp. II) §§ 1426(d) and 1607(i).

It will be noted that plaintiff recruited salesmen through help-wanted advertisements in newspapers. Many of the applicants had had no previous sales experience of any kind. These were trained by the plaintiff. The training consisted of education in the use and purpose of the product, prices, and an explanation of the plaintiff's policies. All sales contracts were to be made in plaintiff's name. The plaintiff expected the salesmen to arise at an early hour and meet the supervisor on a designated street corner for the morning canvass. These salesmen were provided with brochures and other selling material furnished by the plaintiff. They canvassed in a specifically designated row of houses which the supervisor determined. It is true that the salesmen were compensated on a commission basis, and that there was no specific time within which they were required to work. At the same time they were undoubtedly expected to meet the supervisor and if one had repeatedly failed to do so it seems altogether probable, in the light of the total record, that he would not have remained long with the company.

It is also significant that many of these salesmen were not skilled men who came to the plaintiff with an independent calling, nor did they furnish their own

tools and equipment such as is frequently identified with an independent contractor relationship. The only tools and equipment which many of the salesmen had were the literature, calling cards, pamphlets, brochures, and other selling aids which were furnished by the plaintiff. In addition, the plaintiff, through its extensive advertising in newspapers and on radio and television, furnished many leads to the salesmen by referring them to specific people who had shown an interest in the particular product. These leads apparently resulted in fully half of the total sales made. The salesmen were instructed to report to their sales supervisor at 9 a. m. Monday through Thursday for the morning canvass. If a salesman failed to comply with instructions as to methods of selling or areas in which sales were to be made, the company reserved the power to decline to furnish leads to such person.

Since a large proportion of the income of the salesmen came from these leads it was a very powerful weapon, whether used or not, somewhat like the persuading effect of the musket which the early-day settlers of this country traditionally kept behind the door.

It is true the power of control was rarely exercised since the success of the company itself was conditioned upon the efforts of its salesmen. But there is not the slightest doubt that if a salesman had repeatedly failed to meet the morning supervisor and had refused to canvass exclusively within the blocks designated, his lead names would have been withheld, and without these he could not have succeeded in competition with those salesmen who were furnished them. In a sense the salesmen thus had a free choice. They could follow the controlling instructions and probably succeed, or they could refuse to follow and starve insofar as this particular business was concerned.

This degree of control which the plaintiff exercised or could have exercised over its salesmen strongly indicates that an employer-employee relationship existed.

In addition, these salesmen and the plaintiff must have had some thought that an employer-employee relationship had been established because the employees' share of the federal insurance contribution taxes were deducted from the salesmen's commissions apparently without protest from the salesmen, and the salesmen also participated, at plaintiff's expense, in a group life insurance plan. The salesmen knew that the plaintiff maintained liability insurance with respect to those of the salesmen who drove their own automobiles. It is also disclosed that the salesmen sometimes received vacation and pay bonuses and had other favors extended to them.

When these facts are fitted into the picture and framework of an interpretation and determination of the purposes of the social security legislation as disclosed in the discussion by the Supreme Court in the case of United States v. Silk, supra, and other cases by that Court and other United States courts, we cannot escape the conclusion that these salesmen were employed within the meaning of the statute to which reference has been made.

Plaintiff cites a number of cases, including Dimmitt-Rickhoff-Bayer Real Estate Co. v. Finnegan, 8 Cir., 179 F.2d 882, and De-Raef Corporation v. United States, 70 F.Supp. 264, 108 Ct.Cl. 255, and details other facts, but none of these are sufficient to justify a decision favorable to the plaintiff in the light of the entire record.

The petition is dismissed.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

### Findings of Fact.

The court, having considered the evidence, the report of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:

1. The plaintiff is a corporation having its principal office at Philadelphia, Pennsylvania. While it is not actively

engaged in business at present, during all times material herein it operated a factory at Philadelphia for the fabrication of metal storm sashes and doors and four offices for the distribution of those products, located at Philadelphia, Pa., Washington, D. C., Baltimore, Md., and Trenton, N. J.

2. The plaintiff brings this action to recover federal insurance contributions taxes which it claims were erroneously paid by it for the period October 1, 1947 through June 30, 1951. It also seeks to recover federal unemployment taxes which it claims were erroneously paid by it for the years 1947 through 1950. At pretrial conference, the plaintiff, by counsel, conceded that its claim insofar as it relates to payments of tax for the quarter ending September 30, 1947, is barred by the statute of limitations.

The principal issue here is whether certain full-time commission salesmen who, during the pertinent period, were engaged in selling plaintiff's storm windows and doors were or were not employees within the meaning of certain statutes. Pursuant to Rule 38(c) the trial has been limited to the question of the right of recovery, the determination of the amount thereof having been reserved for further proceedings. The parties have agreed that the decision of the court relating to full-time commission salesmen shall be binding also as to part-time commission salesmen.

3. The distribution of the plaintiff's products was handled through two divisions. The wholesale division supplied about 50 accounts from New York State to Virginia. The retail division operated through the offices in the four cities referred to in finding 1, with a general sales manager at Philadelphia in charge of all sales. Each office was under the direction of a sales manager. Salesmen were attracted to the plaintiff by newspaper advertisements placed in the help-wanted columns of the local newspapers. Prospective salesmen were interviewed by the sales manager after filling out a detailed personal history inventory. This form included a statement, "If you

are employed by us, it will be our intention to assist you in making progress." It also included a question as to why the applicant might "want to work for Weatherguard." In recruiting salesmen, the plaintiff sought and accepted many who had had no prior experience in selling as well as others who, with selling experience, had not sold products similar to the plaintiff's. Those prospective salesmen who were selected by the sales manager were given informal instruction in the techniques of measuring windows, estimating, and demonstrating the value of the plaintiff's products.

4. No written agreement was entered into between plaintiff and the salesmen. The relationship between plaintiff and the salesmen, which was based entirely upon an oral understanding, could be terminated at any time without notice. None of the salesmen received any guarantee of compensation. The compensation received was on a commission basis computed on the gross amount of the contracts obtained upon the sale to householders of storm doors and windows. Salesmen were allowed weekly drawing accounts.

5. The sale of plaintiff's products was accomplished by the salesmen in neighborhood areas at the residence of the customer. The plaintiff carried on extensive newspaper, radio and, for a time, television advertising. This resulted in inquiries from prospective customers which were passed on to the salesmen by the sales manager and called leads. The salesmen's commission from sales resulting from leads furnished to the salesmen by the plaintiff was 10 percent, whereas the commission was 15 percent on sales resulting from the door-to-door canvassing activity of the salesmen. The testimony shows that company-furnished leads resulted in from 45 to as high as 70 percent of the salesmen's total sales. Sales were made only to persons who had the plaintiff's products installed by the plaintiff's installation crews.

6. The daily routine of the salesmen consisted of meeting the sales supervisor to whom they were assigned every morn-

ing at 9:30 a. m., Monday through Thursday, and making a house-to-house canvass until noon. Each sales supervisor was assigned a particular area of the city by the sales manager, and the sales supervisor, after mapping the part of such area to be canvassed the following day, told the salesmen where to report. The salesmen were expected to report for the morning canvass. The sales supervisor made a daily report to the sales manager of attendance at the morning canvass and the daily progress of each salesman.

7. The company fixed no hours, days, or times in which the salesmen were required to perform their selling services. The sole exception was the morning canvass which began about 9:30 a. m. and lasted until about 12:00 noon. This was urged by the company to be done on Monday through Thursday. The salesmen were not paid for this work nor were they guaranteed any remuneration regardless of the time or effort put in. The experience of the company demonstrated to the salesmen that this particular time for canvassing was in their best interests as well as the plaintiff's to increase sales because at this time the housewife could usually be found at home while the children were in the morning session of school. At this time leads would be obtained for the purpose of revisiting in the evening to close sales. Any leads developed by the salesmen during this canvass were their sole property and were not turned in to the company for use by someone else. The plaintiff and the salesmen considered this canvass to be mutually advantageous. If the men did not canvass, sales were reduced and neither the salesmen nor the plaintiff would benefit. Where a salesman did not exercise a choice concerning a particular group, he was usually assigned by the sales manager to a supervisor with a group. The men at their own request could move from one group to another when they so desired. Some salesmen canvassed on their own outside the group without objection by the plaintiff. If a salesman did not turn out for the can-

vass the supervisor was not empowered to do anything about it except report the fact to the sales manager. It was suggested to salesmen who missed the morning canvass that their failure to participate was to their own detriment and it was their own business that suffered. Some of the men did not join the morning canvass but preferred to canvass on their own. While the salesmen were not admonished nor were sanctions imposed for their failure to participate in a canvass, it was apparent that those who did appear obtained the greater number of customers and a greater volume of business.

8. The plaintiff company held salesmen's meetings once a week on Friday mornings at the company office. Attendance was usually good, probably for the reason that checks for advances on commissions were usually passed out on Friday. While attendance was urged, it was not mandatory. At these meetings, salesmen who were not producing sufficiently would discuss their lack of production with the sales manager but no sanctions or admonition was taken against them. No one was ever discharged or separated from the company for failure to appear at a Friday sales meeting. Among other things, general discussions of the week's work, differences in pricing, and new methods of installation were discussed. On some occasions when meetings were held, very few salesmen participated. On other occasions the attendance would be good. It was customary at these meetings for salesmen to air their complaints, and criticisms were invited in order to better the relationship between the plaintiff and the salesmen. Discussions often developed around the week's experiences concerning sales resistance and competitive pricing.

9. All contracts were closed in the corporation's name and had to be approved by the plaintiff before installation was undertaken. Usually the credit of the customer was also a factor in determining whether the contract would be accepted. The plaintiff's approval of con-

tracts was necessary before commissions were paid to the salesmen.

10. Cash sales were charged to the customers directly by the corporation. It was the policy of the company that if a cash customer failed to make payments on the contract, the commissions paid the salesman would be charged back against his account. However, about 95 percent of the company's business was on credit, and the contracts and notes accompanying the contracts were discounted through banks in an arrangement where the company received all of its money. If a customer failed to keep up payments under this plan, the bank stood the loss rather than the company, and nothing was charged back to the salesman.

11. The salesmen received no guarantee of any remuneration or compensation, regardless of time or effort put into their selling activity. Compensation was on a commission basis computed on the gross amount of the contracts obtained. This applied both to the full-time and part-time salesmen. If, for some reason, a customer did not fulfill his obligation under the contract even after it was accepted, the salesman did not earn his commission, but when this happened the installation of plaintiff's product had not taken place.

12. In addition to the compensation obtained on the commission basis, the plaintiff, in order to increase the incentive of the salesmen to produce, had a bonus plan which increased their earnings one percent on various levels of earnings during the month.

13. Another bonus termed a "vacation bonus" was paid in June each year to the extent of two percent of the earnings during the previous 12 months. The "vacation bonus" was not a guaranteed payment. Unless the salesman was present and associated with the plaintiff in June, the bonus was not paid.

14. The office facilities of plaintiff were available for use by the salesmen. Desk space was provided together with such secretarial services as the typing of correspondence. The salesmen made most of their telephone calls from the office of plaintiff at plaintiff's expense. Plaintiff provided the salesmen with printed calling cards, pamphlets, brochures, and other selling aids. The salesmen were identified in the printed calling cards, which bore plaintiff's name, as sales representatives.

15. The salesmen were issued detailed price schedules and mimeographed instructions with respect to pricing plaintiff's products. The salesmen were instructed to adhere to established prices, plaintiff attempted to see that those instructions were carried out, and most sales were made pursuant to the established prices. The principal causes for variation from established prices were minor errors committed by the salesmen in making the complicated computation of the total price and engineering or mechanical conditions which could not be determined by the salesmen at the time of sale. On those occasions when it was finally determined that an overcharge had been made, plaintiff credited the salesman involved with an "overage," while an undercharge would result in an "underage," and corresponding adjustments were made on the commission checks. As a general matter, the "overage" and "underage" accounts balanced out over a long period of time.

16. The plaintiff set no quota of sales which the salesmen were required to meet for any given period.

17. The salesmen were required to make no reports of any kind to the company or their supervisors. The supervisors usually filed a report of the progress of the canvass to the sales manager. The salesmen were not required to call the office at any particular time during the day or to report in person to the office. Usually the salesman would contact the office once a day either by personal visit or telephone for his own purposes to pick up leads and messages or to turn in contracts.

18. The plaintiff company had an over-all life insurance policy on all per-

sonnel in its various divisions and departments in which the salesmen also participated. The premiums were paid by the company.

19. It was the policy of the plaintiff company that the salesmen should sell only the Weatherguard products to the exclusion of all others. However, on those occasions where salesmen would sell a competing or noncompeting product, no sanctions were taken. In 1951, a number of the salesmen, while still associated with the plaintiff, sold competing products because of an aluminum shortage there. In normal times, the salesmen made a good living selling Weatherguard products, and there was no need to divide their time by selling for others. While the company urged the salesmen to confine their activities to the plaintiff's products, no sanctions were taken against anyone who sold competitor's products.

20. When the salesmen were outside the company premises, any and all expenses incurred by them, regardless of origin, were their own responsibility and not subject to reimbursement. All expenses incurred while working out of their homes were not subject to reimbursement by the company. This included all expenses relative to the operation and upkeep of their automobiles and other modes of travel, home telephones, entertainment expenses, meals, sporting events and other forms of entertainment. The salesmen furnished their own liability insurance on their cars although the company carried additional insurance for its protection.

21. The selling activity of each salesman was the same and applied to all full-time and part-time salesmen in the organization during the period in question.

22. The plaintiff filed its Employer's Quarterly Federal Tax Return with the Director of Internal Revenue at Philadelphia, Pennsylvania, and paid federal insurance contributions taxes on the remunerations of its commission salesmen during periods pertinent to this suit.

23. The plaintiff also filed its Annual Return of Excise Taxes on Employers under the Federal Unemployment Tax Act with the Director of Internal Revenue at Philadelphia, Pennsylvania, and paid federal unemployment taxes to the defendant on the remunerations of its commission salesmen during periods pertinent to this suit.

24. The plaintiff filed a claim for refund of federal insurance contributions taxes paid on the earnings of certain salesmen covering the period beginning with the third quarter of 1947 (September 30, 1947), to and including the second quarter of 1951 (June 30, 1951), in the amount of $11,339.80.

25. The plaintiff filed claims for refund of federal unemployment taxes paid on the earnings of certain salesmen for the calendar years 1947, 1948, 1949, and 1950, in the respective amounts of $134.78, $516.37, $663.24, and $809.61.

26. These claims were timely filed except so much of the claim for refund of federal insurance contributions taxes as pertained to the quarter ending September 30, 1947, which it is conceded is barred by the statute of limitations.

## Conclusion of Law.

Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and its petition is therefore dismissed.