In re Ralph H. IMHOLTE and Judith
L. Imholte, Debtors.

Ralph H. IMHOLTE and Judith L.
Imholte, Plaintiffs,

v.

UNITED STATES of America,
INTERNAL REVENUE
SERVICE, Defendant.

Adv. No. A89–00644–001.

United States Bankruptcy Court,
D. Alaska.

Aug. 21, 1990.

■■■■■■■■■■■■■■■■

John McGee, Larry L. Caudle & Associates, Anchorage, Alaska, for plaintiffs.

Robert J. Branman, Trial Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

## ORDER

DONALD MacDONALD IV,
Bankruptcy Judge.

I. Introduction.

The Plaintiffs Ralph H. Imholte and Judith L. Imholte (Imholtes) filed a Chapter 7 petition on June 6, 1989, and subsequently filed this adversary proceeding against the Internal Revenue Service on July 10, 1989, seeking a determination of the validity of 940 and 941 employee withholding taxes assessed against them for the years 1984, 1985 and 1986 by the Defendant Internal Revenue Service (IRS). Imholtes contend that they did not have any employees in those years and that all workers in their shop were independent contractors. As such, no taxes were due. The IRS contends that all workers were employees of Imholtes.

II. Facts.[1]

The Plaintiffs started an auto body shop in approximately 1979 called the Ford Body Shop. They later expanded the business to include a parts business called Peninsula Auto Recovery Terminal and Services. Ralph Imholte and Kevin Fulton initially decided to start the business. Fulton and Imholte had prior work experience in auto body repair and were good friends. However, Fulton did not want to take the risk of starting up the business, so Imholte started the business and was owner; Fulton was Imholte's employee (and was paid as such) from 1979 through 1983.

In late 1983 or early 1984, Imholte decided to change the relationship that he had with his workers at the body shop. He decided to do this because work was sporadic and he was having a hard time keeping employees busy for a full 40–hour week. Imholte inquired with his accountant regarding changing the relationship with his workers from employees to independent contractors. Imholte also read an IRS publication which discussed employment taxes and gave a general review of the distinction between employees and independent contractors. Imholte testified that he made the switch from employee to independent contractor at a time when Kevin Fulton had ceased to work for him as an employee. Fulton left to work as a fisherman, but subsequently returned to work for Imholte under the new arrangement. After Imholte made the decision to hire independent contractors rather than employees, he had most of his workers sign a contract regarding their working relationship. These contracts were very similar with the exception of certain blank spaces which were filled in at the time they were signed by the individual. The contracts stated:

> This contract will confirm our discussions and agreements and to clarify the agreement to provide labor on an individual basis between Ralph Imholte doing business as The Ford Body Shop and Peninsula Auto Recycling Terminal and Services here after known as the contractor, and (name) here after known as the sub contractor.

> The contractor or his representitive (sic) will contract with individual companys (sic), corporations and government agencys (sic) to repair damage to motor vehicles and equipment and the sale of new and used parts of motor vehicles and equipment.

> The contractor will provide a facility, utilities, parts, materials and equipment normaly (sic) considered to be shop

---

1. The record in this case is woefully sparse. It consists almost entirely of the testimony of Plaintiff Ralph Imholte and some documents. None of the alleged "employees" testified in court for either party. Very few invoices for wages paid were produced by the Plaintiffs. The Defendant Internal Revenue Service produced but one witness, an Agent whose testimony was of little value. Against this barren background, the court must make its findings.

equipment of the recycling and repair trades.

The contractor will purchase from individual companys (sic), corporations and government agencys (sic) motor vehicles with damage to be repaired and sold or dismantled and sold as parts.

Subcontractors will provide all hand tools necessary to perform their trade. They will be responsible for keeping their work area clean.

All work performed will be done in a craftsman like manor (sic) to factory standards or better.

The subcontractor agrees to provide labor at (percent) unless mutualy (sic) agreed between the contractor and subcontractor.

Subcontractors will submit an itemized statement to the contractor on the first and the fifteenth of every month. Statement will be paid upon receipt and approval.

Having agreed to the foresaid we hereby put this agreement into effect on (date). If the agreement is operating to the satisfaction of both partys (sic) it shall be continued for an indefinite period but can be cancelled by either party upon written notice.

Imholte hired three categories of workers during the years in question. He hired auto body workers, who were allegedly paid 50% of the estimated repair ticket for each job.[2] He hired workers to pull parts, who were paid an hourly rate. He also paid one individual, Ed Moss, by the week, for his services in starting up and running a parts business, where spare parts were pulled from junk cars which Imholte purchased. Invoices for services were made out by the workers on a biweekly basis. These invoices reflect that at least some of the workers, on occasion, took advances or draws against their earnings for a particular period.

The contracts introduced into evidence at trial reflect that Imholte retained the following workers on the following dates:

| Date | Worker | Rate |
|------|--------|------|
| Nov. 15, 1983 | Rhys Burger | $5.00 per hour |
| Jan. 1, 1984 | Jerry Huff | 50% of shop rate |
| Feb. 1, 1984 | Kevin Fulton | 50% |
| Apr. 20, 1984 | Jearl Smith | 50% of estimate |
| Oct. 1, 1984 | Edward Moss | $200.00 per week |
| Jul. 1, 1984 | Bryce Burger | $5.00 per hour |
| Jan. 15, 1985 | Dan Smith | 50% of estimate |
| Feb. 15, 1985 | Scott Misner | $5.25 per hour |

Testimony revealed that Imholte had other workers as well, for whom contracts were not produced.

With the exception of an air compressor, a frame rack, and a painting booth, which were provided by Imholte, the body shop workers and the parts men provided their own tools for their jobs. Imholte provided a place to work and paid the utilities. The body shop workers provided tools valued between $5,000–15,000, in connection with their work. The parts men's tools were worth as much as $2,000–3,000. Each worker kept his tools either at the shop or in his own vehicle. Both the body shop men and the parts men could refuse to do certain jobs, and kept their own hours, although they were mostly at work during regular business hours. Some of the body shop men, on occasion, hired their own helpers, who they paid rather than Imholte. At least one of the body men worked at other body shops during the same time period that he was working for Imholte. If any of the workers turned down jobs because they had other jobs or simply didn't want the work, Imholte would have to either find someone else to do the work or do it himself. Imholte could not compel them

2. The evidence on this point is sharply conflicting. While Imholte alleges payment based on 50% of the shop rate, the pay records of Jerry Huff indicate a monthly salary or hourly wage for a substantial period of time.

to do the work. One of the body men also did custom painting, and he would sometimes take some of his jobs out of Imholte's shop.

On occasion, Imholte would leave one of the body men in charge of the body shop while he worked as a boilermaker. Imholte would perform work as a boilermaker for approximately 6 to 8 weeks each year so that he could accrue enough hours to maintain his union pension benefits. When a particular body man was left in charge on these occasions, he would be paid a weekly salary for managing the shop.

Parts pullers were paid $5.00 an hour. Their skills were relatively minor. They simply took parts off of wrecked vehicles. They used their own tools, but such tools did not have to be extensive. They could come and go as they pleased but generally stayed during business hours. Scott Misner, a parts puller, also did work on Imholtes' house.

Ed Moss was paid on a weekly basis for his services in setting up and running the parts business. Moss started at $200 per week and his pay gradually increased as the parts business picked up. Moss, an amputee, did not pull parts from vehicles. Moss was paid regardless of whether he was at the shop or occasionally working at another business located across the street from Imholte's shop. Imholte testified that he hired the other parts men on the basis of Moss's recommendations, although the contracts reflect that he hired one parts man, Rhys Burger, before Moss signed his contract with Imholte.

## III. Legal Analysis.

Employee is defined, in 26 U.S.C. § 3121(d)(2) as:

any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee.

Factors to be considered, in making the determination, according to the Supreme Court, are the industry's right to control how work shall be done, opportunities for profit or loss, investment in facilities, permanency of relation and skill required in the claimed independent operation. No one factor is controlling, "nor is the list complete." *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469–70, 91 L.Ed. 1757 (1947). The court also pointed out "[I]t is quite impossible to extract from the statute a rule of thumb to define the limits of the employer-employee relationship." *Id.* at 716, 67 S.Ct. at 1469.

Other courts have considered several factors in determining whether such a relationship exists, including:

(1) the right to control the details of the work; (2) furnishing of tools and the work place; (3) withholding of taxes, workmen's compensation and unemployment insurance funds; (4) right to discharge; and (5) permanency of the relationship.

*Professional & Executive Leasing, Inc. v. C.I.R.*, 862 F.2d 751, 753 (9th Cir.1988).

A 1975 Wisconsin district court case gave an excellent summary of the many possible factors a jury should consider in determining whether or not a body repairman was an employee or an independent contractor. Paraphrasing the court in *E & W Auto, Inc. v. U.S.*, 35 A.F.T.R.2d 75–794, 75–795, 796 (E.D.Wi.1975), they are:

(1) right to control the details and manner of performance;

(2) manner of payment by the job or by the hour;

(3) right to discharge without cause;

(4) furnishing of tools, equipment and a place to work;

(5) permanency of the relationship and length of time of employment;

(6) intention of the parties and their belief as to the relationship;

(7) skill required;

(8) offering of services to general public rather than to one individual;

(9) investment required and opportunity for profit;

(10) is the undertaking part of the business of the Plaintiff;

(11) were auto body repairmen individually carrying on an independent business or whether they worked in the course of

Plaintiff's general business and were an integral part thereof;

(12) did alleged contractor hire employees;

(13) did Plaintiff have the right to assign work, assign a place for work, or assign the work to others;

(14) carrying of Workers' Compensation Insurance or other insurance.

Despite the fact that no one factor is controlling, "employer control over the manner in which the work is performed, ... is the basic test." *General Investment Corp. v. U.S.*, 823 F.2d 337, 341 (9th Cir. 1987).

The test for determining employer control is set out in a Treasury regulation as follows:

> Generally, such relationship exists when the person for whom services are performed has the right to control and direct the individual who performs the services, not only as to the result to be accomplished by the work but also as to the details and means by which that result is accomplished. That is, an employee is subject to the will and control of the employer not only as to what shall be done but how it shall be done. In this connection, it is not necessary that the employer actually direct or control the manner in which the services are performed; it is sufficient if he has the right to do so.

*Professional & Executive Leasing, Inc., supra* at 753, citing Treas.Reg. § 31.3121(d)–(1)(c)(2) (1980).

There are only two reported decisions directly dealing with body repairmen as employees. *Entner v. United States*, 67 F.Supp. 684 (S.D.Ohio 1946) was a non-jury case. Entner owned an automobile dealership. He rented a portion of the real property to John Hall. Hall painted cars and repaired fenders. Hall paid Entner 30% of his gross receipts for rent and assistance in billing. Entner had no control of Hall's work. Hall had a sign of his own which stated "John Hall, Repair of Automobiles" and frequently hired employees. The court found Hall to be an independent contractor.

The only other decision dealing with auto body repairmen is the jury decision found in *E & W Auto, Inc.* A jury applied the previously listed factors to an auto body repair business located in Milwaukee. The jury found for the employer. Auto body repairmen were found to be independent contractors. *E & W Auto, Inc.*, 35 A.F.T. R.2d 75–794.

■ With two exceptions, I find the auto body repair workers in this case to be independent contractors. Imholte was only able to control the end result of their work, and not the manner in which the work was performed. The body workers had some degree of control over their earning capacity, as their salary (the 50% share of the estimated ticket) could be increased if they worked faster than estimated and performed more jobs in a day. The body workers had discretion over how the job would be performed, and could refuse to do jobs. The body workers sometimes provided estimates for jobs independently of Imholte. They were skilled workers earning as much as five times minimum wage. Their relationship with Imholte was "at will", and either party could terminate it without cause. The tools provided by the body workers were significant and essential to their work. The workers hired and paid for their own assistants, if needed.

■ I do not find body man Jerry Huff to be an independent contractor, however. He ran the shop when Imholte was away. He was not paid by the job. The records reveal payment of a consistent salary based on a monthly or hourly rate (Government Exhibit "D"). I find Imholte had the right to exercise control over the manner of Huff's performance. He exercised management functions on occasion and was not an independent contractor.

■ The second exception arises when other auto body repairmen ran the shop for Imholte. Employment was for a specified period of time for a specified purpose and for a specified salary. Further, Imholte had the right, even if he may not have exercised it, to direct the body worker as to how his management functions were to be performed. Accordingly, to the extent that

any of the body shop men worked as manager of the shop in Imholte's absence, they were employees rather than independent contractors for the period of time that they managed the shop, and only to the extent of the salary they received for their managerial functions.

 The parts pullers were employees of Imholte. The circumstances of the parts men in this case are not unlike those of the coal unloaders in *U.S. v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947). In *Silk*, the unloaders worked as they wished, often intermittently, and provided their own tools. Here the parts workers could not control their earning capacity in the way that the body workers could, and did not have the same degree of responsibility in performing a particular job that the body workers did. Further, although they too provided tools on the job, the tools were much simpler, and their investment in the tools smaller, than in the case of the body workers. The fact that the parts pullers may have kept irregular hours, or could have refused to pull a part on occasion, is irrelevant. They were paid by the hour to perform a task which does not require much professional discretion and, thus, were employees of Imholte rather than independent contractors.

Ed Moss, the parts manager, was also an employee. Because Imholte had little knowledge of the parts business, he hired a manager who did. Moss was not an auto body repairman. He did not possess special skills in any one profession. He managed the parts business in exchange for a salary which increased with the success of the business. As the owner of that business, Imholte had the right to control the parts operation. The fact that he claims not to have exercised that right is immaterial. Moss provided no tools. He had no investment in a business for profit. He hired no independent employees. Ed Moss was an employee.

Therefore, IT IS HEREBY ORDERED:

1. The 940 and 941 Employee withholding taxes assessed for the years 1984, 1985 and 1986 are invalid only to the extent that they represent taxes for auto body repairmen other than Jerry Huff when such body repairmen were not acting in a management capacity;

2. Any tax assessments inconsistent with the provisions of paragraph 1 hereof are to be set aside and expunged from the tax records of the Plaintiffs.

3. Each party shall bear their own costs and attorney's fees.