Revised December 7, 1998

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 97-10764

ALEXIS M. HERMAN, SECRETARY OF LABOR, UNITED STATES DEPARTMENT OF LABOR,

                                        Plaintiff-Appellant,

VERSUS

EXPRESS SIXTY-MINUTES DELIVERY SERVICES, INC., LYNN WILLIAMS CLAYTON, CHARLES CLAYTON AND DEE ANN HOPKINS,

                                        Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

December 4, 1998

Before KING, SMITH, and PARKER, Circuit Judges.

ROBERT M. PARKER, Circuit Judge:

The Secretary of Labor appeals from a take-nothing judgment entered by the district court in this Fair Labor Standards Act (FLSA) case. 29 U.S.C. §§ 201, *et seq.* We affirm.

Procedural Background

Appellant, the Secretary of Labor, brought this FLSA action seeking to enjoin Appellee Express 60-Minutes Delivery Service, Inc. ("Express") from violating the minimum wage, overtime compensation, and record keeping provisions of the Act. After a six-day bench trial, the district court concluded that no violation of the FLSA occurred because the courier delivery drivers were independent contractors. The district court further concluded that assuming that the drivers were employees, the Secretary failed to meet her burden of establishing that the requested damages were reasonable. Finally, the district court concluded that the Secretary failed to establish that any office workers were owed back wages.

Factual Background

A. Drivers

Express operates a courier delivery service in Dallas and Tarrant Counties, Texas. Lynn Clayton is the president of Express, Charles Clayton is the vice-president, and Dee Ann Hopkins is the secretary-treasurer. Express contracts with various businesses, including law firms, hospitals, and laboratories, to deliver packages on a 24-hour basis in and around the Dallas-Fort Worth metropolitan area. Over 50% of the packages delivered by Express contain medical blood or tissue samples. Express averages around 525 deliveries each day. To make these deliveries, Express relies on about fifty drivers on its payroll at any given time. The

drivers are recruited by Express through newspaper advertisements and word of mouth.

Customers of Express choose among various delivery options under which Express agrees to complete its deliveries within either one, two, or four hours of when an order is placed. Express uses a computer-dispatch system wherein orders are taken by customer service personnel over the telephone, entered into the computer, and transferred to dispatchers who assign the deliveries. The dispatchers communicate with the drivers by pager, two-way closed-channel radio, and telephone. While different factors guide their decisions, the dispatchers generally offer a delivery to the last on-duty driver to have received an offer who is closest to the pick-up point.

Express bills its customers based upon several factors including the size of the package, the priority of its delivery, and the distance between the pick-up and delivery point. Express negotiates special flat rates for approximately twenty-two regular customers. Express also negotiates with its customers over how much waiting time they will be allotted without additional charge.

Potential drivers are required to attend an orientation session at which they must sign an "Independent Contractor Agreement" providing that they will make deliveries for Express using their own vehicles in exchange for receiving a commission for each delivery equal to a percentage of the customer's cost. Under the agreement, drivers also pay the costs of their gasoline,

3

vehicle maintenance, and insurance. Most drive a vehicle that they also use personally.

The "Independent Contractor Agreement" also provides that drivers will furnish their own uniforms, radios and pagers, as well as the biohazard bags and dry ice required for transporting medical samples. These items are supplied to the drivers by Express, which leases some of the items to the drivers and deducts the cost from their first few paychecks. Drivers supply their own dollies and MAPSCOs, and, if needed, their own tarps and cords for covering and securing items.

The drivers can and do negotiate for increased commissions, but most drivers do not negotiate their commissions. The drivers have no input into how Express's business is conducted, the amount charged its customers, or the allocation or frequency of deliveries.

The drivers may use only those radios supplied by the company, because the radios operate on a private channel that Express licenses from the Federal Communication Commission. Most drivers wear a uniform consisting of a blue shirt and khaki pants. One shoulder of the shirt has a patch with an Express logo and the other shoulder sports an "Independent Contractor" patch. Uniforms are not required, but preferred.

In signing the "Independent Contractor Agreement," a driver agrees to apply to become a notary public and to provide notary service to Express and its customers free of charge. Express

4

supplies the drivers with the notary application, and deducts the cost for the notary bond and stamp from each driver's first ten paychecks. Although not required, most drivers become notaries.

Pursuant to their contracts, drivers agree to make themselves available to work on-call for Express's 24-hour delivery service. A majority of the drivers who testified stated either that they were required to work on-call or that they had no input into when their on-call time was scheduled. Express posts the on-call schedules at its offices and informs drivers that if unable to work, they are responsible for finding a replacement.

Drivers work for Express for varying lengths of time, with the majority working for relatively short periods. Several drivers testified that they had worked for other courier companies in the Dallas-Fort Worth area either prior to or after working for Express. Only one driver testified that he worked for another courier company while working for Express. The "Independent Contractor Agreement" does not contain a covenant-not-to-compete.

No prior experience is necessary to become a courier driver, but couriers need to be able to drive, read maps, and be courteous to customers. By using their judgment as to the best routes available and their knowledge about area traffic patterns, drivers may earn more money because they can make their deliveries faster and be available to make more deliveries.

Under the terms of the contract, the drivers have the right to accept or reject individual offers of delivery jobs, and have no

5

obligation to accept any specified number of jobs during any given period.  Drivers confirmed that they could decline offers without being subjected to retaliation.

In addition to the drivers that Express considers independent contractors, the company employs four drivers it considers employees.  The employee-drivers run errands for Express and make routine deliveries when the office is busy.  They attend the same initial orientation session as the other drivers.  Unlike the contract drivers, the employee-drivers (1) report for work at a specified time; (2) are paid by the hour; (3) work a set number of hours that are determined by Express; (4) are required to wear a uniform; (5) are provided with a company vehicle and all of the necessary tools of the trade; (6) are reimbursed for expenses; (7) are not allowed to turn down deliveries; and (8) are under the control and supervision of Express.

B.   Office Workers

The Secretary sought to establish an overtime claim on behalf of eleven office workers at Express.  During her investigation, the Secretary determined that clerks worked fifty-five hours a week but were not being paid overtime compensation for all hours worked over forty.  Lynn Clayton testified that much of the data on which  the Secretary's calculations were based was incorrect.  Specifically, the employment dates of a number of individuals for whom overtime was claimed was incorrect and in computed damages, a fifty-five

6

hour work week was assumed rather than the hours actually worked. The district court found that the Secretary's calculations on this claim were neither reliable nor accurate, and that the Secretary failed to present sufficient credible evidence to support claims for back wages for the eleven office workers.

Analysis

A.   Drivers

To determine employee status under the FLSA, we focus on whether the alleged employee, as a matter of economic reality, is economically dependent upon the business to which he or she renders his or her services. *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043, 1054 (5th Cir. 1987). In other words, our task is to determine whether the individual is, as a matter of economic reality, in business for himself or herself. *Donovan v. Tehco, Inc.*, 642 F.2d 141, 143 (5th Cir. 1981). To aid us in this task, we consider five factors: the degree of control exercised by the alleged employer; the extent of the relative investments of the worker and alleged employer; the degree to which the worker's opportunity for profit and loss is determined by the alleged employer; the skill and initiative required in performing the job; and the permanency of the relationship. *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 327 (5th Cir. 1993). No single factor is determinative. *Id.*

We review the district court's findings as to these five factors for clear error, but we review the district court's ultimate determination of employee status de novo. *Id.*

### 1. Degree of control exercised by the alleged employer

The district court found that Express had minimal control over its drivers. We agree. The drivers set their own hours and days of work and can reject deliveries without retaliation. It is preferred that drivers wear a uniform and become notaries, but it is not required of all contract drivers. The drivers can work for other courier delivery systems, and the "Independent Contractor Agreement" does not contain a covenant-not-to-compete. Although the drivers are required to attend an orientation session and required to be on-call, these facts do not outweigh the other facts indicating a lack of control and independent contractor status. This result is even clearer when one contrasts Express's employee-drivers who, unlike contract drivers, report for work at a specified time; are paid by the hour; work a set number of hours that are determined by Express; are required to wear a uniform; are not allowed to turn down deliveries; and are under the control and supervision of Express.

The degree-of-control factor points toward independent contractor status. Such a finding by the district court is not

8

clearly erroneous.

2.    Relative investment of worker and alleged employer

The district court found that the investment on the part of the drivers was significant.  The district court first pointed out that Express does not provide drivers with any equipment--drivers were required to purchase or lease all the necessary tools of the trade including a vehicle, automobile insurance, dolly, MAPSCO, tarp, two-way radio, pager, and a medical delivery bag.  The drivers also were responsible for all fuel, maintenance, and depreciation of their vehicles.

The Secretary counters that most drivers use their automobiles for personal and recreational purposes as well as for business, so that the capital risk on the part of the drivers is not substantial.  Further, the Secretary argues that the relative investment of Express far exceeds that of the drivers, explaining that Express operates offices in two locations, uses a sophisticated computer system, purchases the equipment that it leases to its drivers, pays to license a closed-channel radio frequency from the Federal Communications Commission, and pays the salaries of twenty-five office employees.  While the Secretary did not discuss in her brief the dollar amount of investment of Express, an independent review of the record reveals the following:
a.    monthly lease on Fort Worth office = $1500-$1900

b.    monthly lease on Dallas office  = several hundred dollars

c.    60-65 radios at $600 a piece

d.    air time for radio = $17 per month for each radio

e.    biweekly payroll = approximately $19,000

f.    four vehicles = approximately $14,000 each

g.    fax machine = $250

h.    computer system = $25,000

R.Vol. XI-117; XII-86-91.

The relative investment by Express is indeed significant. Although the driver's investment of a vehicle is no small matter, that investment is somewhat diluted when one considers that the vehicle is also used by most drivers for personal purposes. In *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330 (5th Cir. 1993), the court found that welders were independent contractors partly because the welders invested an average of $15,000 each for welding equipment. There was no indication in *Carrell* that the welding equipment also was being used for personal purposes. Accordingly, the capital risk in *Carrell* was much greater. In *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1051 (5th Cir. 1987), the court noted that a fireworks stand operator who used a computer to assist him while working involved no investment because he originally had purchased the home computer for school work. Even considering the additional maintenance on a vehicle which is used for a delivery service, we nonetheless conclude that the

10

district court clearly erred in finding the drivers' relative investment to be significant.

The district court also concluded that, although no direct testimony was presented on this point, the aggregate investment of all the contract drivers is substantially more than that of Express. However, we find no support for the application of an aggregation principle with respect to the relative investment factor. *See, e.g., Carrell v. Sunland Construction, Inc.*, 998 F.2d 330 (5th Cir. 1993) (court of appeals did not combine the welder's average individual investment of $15,000 in trucks, machines, and tools when considering the relative investment factor).

The relative investment factor weighs in favor of the Secretary and toward employee status.


3. Degree to which employee's opportunity for profit and loss is determined by the alleged employer

The district court found that the drivers are compensated on a commission basis. According to the district court a driver's profit or loss is determined largely on his or her skill, initiative, ability to cut costs, and understanding of the courier business. The district court observed that the drivers who made the most money appeared to be the most experienced and most concerned with efficiency, while the less successful drivers tended to be inexperienced and less concerned with efficiency.

11

Although the Secretary maintains that express controls customer volume and the amount charged to customers, we cannot say that the district court clearly erred in finding that the drivers' opportunity for profit and loss was determined by the drivers to a greater degree than Express. This is especially true because the drivers had the ability to choose how much they wanted to work and the experienced drivers knew which jobs were most profitable.

This factor points toward independent contractor status. The district court did not clearly err.

### 4. Skill and initiative required

The district court found that once a job is offered to the driver, the driver is not told which route to take--the driver must rely on his own judgment, knowledge of traffic patterns and road conditions in the Dallas-Fort Worth metroplex, ability to read a MAPSCO, and ability to anticipate the need for an alternate route. According to the district court, experienced drivers possess specialized skills beyond that of merely driving an automobile, and more experienced drivers tended to make more money than less experienced drivers.

The Secretary argues that the contract drivers are more like wage earners than independent entrepreneurs seeking a return on their risky capital investment. The Secretary is correct. In *Mr.*

12

*W Fireworks*, 814 F.2d at 1053, we explained that "initiative, not efficiency, determines independence." In that case, the court found clearly erroneous the district court's finding that fireworks stand operators had the skill and initiative indicative of independent contractors. In doing so, the court referred to *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976), where the court reasoned that "routine work which requires industry and efficiency is not indicative of independence and nonemployee status." The court further explained in *Mr. W Fireworks* that the operators were unable to exert initiative as "all major components open to initiative--advertising, pricing, and most importantly the choice of fireworks' suppliers with which to deal are controlled by Mr. W." *Mr. W. Fireworks*, 814 F.2d at 1053.

As we found in *Pilgrim Equipment*, the "key missing ingredient in the lower court's determination is initiative." 527 F.2d at 1314. The district court did not discuss initiative during its evaluation of this factor. We agree with the Secretary that the skill and initiative factor points toward employee status. The district court clearly erred in finding to the contrary.

5. Permanency of the relationship

The Secretary conceded at oral argument that the district court correctly determined the permanency issue. We agree. The

13

majority of drivers work for Express for a short period of time. Drivers are able to work for other courier delivery companies, and the "Independent Contractor Agreement" does not contain a covenant-not-to-compete. The permanency factor points toward independent contractor status.

6.    Other factors

Both sides encourage the court to look to other factors in addition to the preceding five factors. The Secretary emphasizes that the work performed by the drivers is an integral and indispensable part of Express' business. Express argues that the contract provided that the drivers were independent contractors and the drivers' uniforms indicate same.

The determination of employee status is very fact intensive, and "as with most employee-status cases, there are facts pointing in both directions. *Carrell v. Sunland Construction, Inc.*, 998 F.2d 330, 334 (5th Cir. 1993). In this case, three of the five traditional factors point toward independent contractor status. We conclude that the district court did not err in finding that the drivers were independent contractors.

We are confident in this result not only because the various factors weigh in favor of independent contractor status, but also

14

because of Supreme Court precedent with respect to this issue. In *United States v. Silk* and *Harrison v. Greyvan Lines, Inc.*, 331 U.S. 704 (1947), a consolidated case, the court concluded that the drivers were independent contractors. In *Silk*, Albert Silk, doing business as Albert Silk Coal Co., sold coal at retail. His coalyard consisted of two buildings, one for an office and the other a gathering place for workers. Silk owned no trucks himself but contracted with workers who owned their own trucks to deliver coal at a uniform price per ton. When an order for coal was taken in the office, a bell rang in the building used by the truckers. The truckers voluntarily adopted a call list upon which their names came up in turn, and the top man on the list had the opportunity to deliver coal. The truckers could and often did refuse to make a delivery without penalty. The truckers were not instructed how to do their jobs, but were merely given a ticket telling them where the coal was to be delivered and whether to collect the charge. Any damage caused by the truckers were paid by the company. The truckers could go as they please and could haul for others when they pleased. The truckers paid all expenses of operating their trucks.

*Greyvan Lines* involved an interstate trucking business carrying mostly household furniture. Here the truckers were required to haul exclusively for Greyvan; furnish their own trucks and necessary equipment; furnish their own insurance; pay for all

15

loss or damage to shipments; pay all expenses of operation; indemnify the company for any loss caused by the truckers; paint the designation "Greyvan Lines" on their trucks; collect all money due the company from shippers or consignees; personally drive their trucks at all times or be present on the truck when a competent relief driver was driving; and follow all rules, regulations, and instructions of the company. As remuneration, the truckers received from the company a percentage of the tariff charged by the company. The contract was terminable at any time by either party. A contract between the company and Local No. 711 of the International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America was in effect.

In both *Silk* and *Greyvan Lines*, the Court concluded that the truckers were independent contractors. The Court reasoned that these drivers owned their own trucks and were small businessmen. The control exercised, the risk undertaken, and the opportunity for profit from sound management led the Court to conclude that the truck drivers were independent contractors. In *Greyvan Lines*, the drivers were required to haul exclusively for the company and to paint the company logo on their vehicles; nonetheless, the Supreme Court concluded they were independent contractors. Comparatively, it is easier to conclude independent contractor status for the drivers in the case at bar.

Finally, the Secretary maintains that the drivers in this case

16

are analogous to piece-workers who have been held to be employees in numerous instances. *See, e.g., McLaughlin v. Seafood, Inc.*, 867 F.2d 875 (5th Cir. 1989) (seafood backers, pickers, and peelers are employees under FLSA); *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308 (5th Cir. 1976) (operators of laundry pickup stations are employees under FLSA); *Dole v. Snell*, 875 F.2d 802 (10th Cir. 1989) (cake decorators are employees under FLSA). We disagree. More analogous to the Express contract drivers are the welders in *Carrell* and the truck drivers in *Silk* and *Greyvan Lines*.

The conclusion of the district court that the drivers were independent contractors is affirmed. Accordingly, we need not address whether the Secretary met her burden of establishing that the requested damages were reasonable.

B. Office Workers

Section 207 of the FLSA provides in pertinent part:

> . . . [N]o employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). The Secretary claims that office workers at Express were not paid for their overtime worked. It is well-settled that the Secretary's burden is met if it is proved that the employee has in fact performed work for which he or she was improperly compensated and if the employee produces sufficient

17

evidence to show the amount and extent of that work as a matter of just and reasonable inference. *See Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

The Secretary's claim for back wages was supported at trial by the testimony of Shirley Kenyon who presented an exhibit purporting to reflect the overtime due these employees. Kenyon's testimony was rebutted by Lynn Clayton's testimony which indicated that the employment dates Kenyon used were incorrect and that Kenyon assumed that each employee worked a 55-hour week, rather than the 45-hour week actually worked. Lynn Clayton further testified that her office employees were being paid time and a half for overtime hours worked prior to the Secretary's investigation. Although Clayton had changed her method of record keeping, she testified that the office employees were being paid the same amount today as they were getting paid before the Secretary's investigation. R. Vol. XI-214-15. The district court concluded that the Secretary failed to present sufficient credible evidence to support claims for back wages for the office workers. We perceive no error in this conclusion, and the Secretary fails to point to any evidence in the record and fails to cite any binding precedent to support its position that a violation of the Act occurred. The Secretary's citation of *Nunn's Battery & Electric Co. v. Goldberg*, 298 F.2d 516 (5th Cir. 1962) offers no assistance to the court because in that

18

case the Secretary introduced evidence into the record indicating that no explicit understanding existed between the parties as to the existence of a regular wage rate that is increased for overtime hours. The court pointed to abundant testimony by numerous employees that they were not told what their hourly rate of pay was. The Secretary points to no such evidence in the record and makes no inference in her brief to that effect. Based upon the limited briefing and record citation on this issue, the court cannot discern how the Secretary proved that a violation of the Act even occurred.

Because we agree with the district court that the Secretary failed to provide sufficient evidence to support her claims, we need not address whether the Secretary produced sufficient and accurate evidence of damages.[1]

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.

---

[1]We note that the Secretary's post-trial brief with respect to this issue focused solely on whether it accurately calculated damages for overtime pay. The brief did not address the merits of whether a violation of the Act even occurred. R. Vol. VI-1191-93.

KING, Circuit Judge, concurring in part and dissenting in part:

I agree with the district court that the evidence proffered by the Secretary of Labor on damages was deficient and I would therefore affirm the district court's take nothing judgment. I disagree, however, with the district court's decision, affirmed by the majority, that Express's drivers are independent contractors, and I therefore respectfully dissent from the majority's decision to affirm the denial of an injunction ordering prospective compliance with the minimum wage, overtime compensation and recordkeeping requirements of the Fair Labor Standards Act.

I agree with and applaud the majority's conclusion that two of the district court's findings of fact are clearly erroneous---the finding regarding the relative investment of the worker and the employer and the finding regarding the skill and initiative required by the worker. But I also would hold clearly erroneous the district court's finding regarding the degree to which the worker's opportunity for profit or loss is determined by the employer. In my opinion, this factor also weighs in favor of employee status. Further, in view of the entirety of the circumstances, I would hold that Express's drivers are employees

20

rather than independent contractors.

Although the district court's findings in connection with each of the <u>Silk</u> factors are reviewed for clear error,

> we must ensure that the factfinding of the district court is performed with the proper legal standards in mind. Only then can the inferences that reasonably and logically flow from the historical facts represent a correct application of law to fact. The district court's analysis, of course, is subject to plenary review by this court, to ensure that the district court's understanding of the law is proper.

<u>Brock v. Mr. W Fireworks, Inc.</u>, 814 F.2d 1042, 1044-45 (5th Cir. 1987). In order to evaluate the district court's finding regarding the ability of Express's drivers to control their opportunity for profit or loss, it is therefore necessary to understand the principles that inform the courts' evaluation of this factor. The ultimate conclusion as to whether the workers are employees or independent contractors is reviewed de novo. <u>See</u> <u>id.</u> at 1045. I address each inquiry in turn.

A court's most important task in analyzing the profit or loss factor is to ascertain which party controls the major determinants of the worker's ability to make a profit. <u>See</u> <u>Reich v. Circle C. Investments, Inc.</u>, 998 F.2d 324, 328 (5th Cir. 1993); <u>Mr. W Fireworks</u>, 814 F.2d at 1050; <u>Usery v. Pilgrim Equip. Co.</u>, 527 F.2d 1308, 1313 (5th Cir. 1976). If the employer largely controls these major determinants, this points toward a finding of employee status. On the other hand, if the workers themselves exert substantial control over their ability to profit or over the likelihood that they will suffer loss, they are more like

21

independent contractors. See Circle C. Investments, 998 F.2d at 328; Mr. W Fireworks, 814 F.2d at 1051; Pilgrim Equip., 527 F.2d at 1313.

We have defined "profit" as the "gain realized from a business over and above its [capital] expenditures." Mr. W Fireworks, 814 F.2d at 1050-51 (alteration in original) (internal quotation omitted); see Silent Woman, Ltd. v. Donovan, 585 F. Supp. 447, 451 (E.D. Wis. 1984). Thus, the extent to which the workers have invested capital that is subject to the risk of loss is also relevant. See Mr. W Fireworks, 814 F.2d at 1050-51; Pilgrim Equip., 527 F.2d at 1313. If the workers have sizeable capital investments at stake, they are more akin to "independent entrepreneurs seeking a return on their risky capital investments," than to employees. Mr. W Fireworks, 814 F.2d at 1050-51; see Pilgrim Equip., 527 F.2d at 1313 (finding that no opportunity for loss of capital investment indicates dependence, and, thus, employee status).

A line of Fifth Circuit precedent has clarified which determinants of profit are most relevant in determining whether a worker's opportunity for profit or loss is controlled by an employer. Several factors reoccur throughout the case law. In finding that the employer controlled the major determinants of profit in Usery v. Pilgrim Equipment Co., the court emphasized that the employer, an owner of laundry pick-up stations, controlled the prices charged, the location of each store, and the advertising for

22

the business.  See 527 F.2d at 1313.  The court concluded that these factors outweighed the factors controlled by the operators---the convenience of the hours of operation, extra services provided, and rapport with customers.  See id.  Moreover, the court refused to find that the operators' risk of losing their capital investment was significant where the only risk of loss faced was the risk of bad-check and theft losses and it was the employer who placed this burden upon the operators.  See id.

Similarly, in Brock v. Mr. W Fireworks, Inc., the court found that the employer, an owner of fireworks stands, controlled the largest determinants of profit---again emphasizing the prices charged, the location of the stands, and the advertising.  See 814 F. 2d at 1050.  The court acknowledged that the factors controlled by the employees---experience and good customer rapport---increased earnings, but did not consider these to be as relevant as the factors controlled by the employer.  See id.  As in Pilgrim Equipment Co., the court further found that the stand operators were subject to a minimal risk of loss because their capital investment was limited to the burden of bearing bad-check and theft losses, a burden forced upon them by their employer.  See id. at 1050-51.  The court therefore concluded that the profit and loss factor weighed in favor of employee status.  See id. at 1051.

Most recently, in Reich v. Circle C. Investments, Inc., the court found that the employer, a nightclub operator, controlled the determinants of profit or loss to a greater extent than the dancers

23

who worked at the nightclubs because the employer was responsible for advertising, location of the clubs, business hours, maintenance and appearance of facilities, and the refreshments served. See 998 F.2d at 328. These factors controlled customer volume, which, according to the court, was the largest factor that influenced a dancer's ability to profit. See id. Moreover, in the court's view, control over customer volume was more relevant in determining profit than the dancers' initiative, hustle, and costume. See id.

In light of these cases, it is clear that the district court did not properly assess the drivers' ability to control their profits or losses. The district court found, in essence, that Express's drivers have control over the hours they work, their efficiency, experience, and skill,[2] and the amount of their commissions.[3] These findings, even if true, are vastly outweighed

---

[2] The district court's finding that a "driver's profit or loss is determined largely by his or her skill, initiative, ability to cut costs, and understanding of the courier business," is clearly erroneous in light of the legal principles discussed above. While a driver's skill, initiative, ability to cut costs, and understanding of the business may certainly contribute to the amount of money that he or she earns, as discussed further infra, by far the larger determinants of the drivers' ability to profit are the number of runs available to each driver, the number of runs actually offered to each driver, and the price charged per run--- all factors controlled by Express. It was clearly erroneous for the district court to overlook these larger determinants of profit or loss.

[3] A review of the record indicates that the district court erred in finding that "Express drivers can and do negotiate for increased commissions." The vast majority of drivers do not negotiate for increased commissions. At the onset of employment, the drivers are given a standard form contract to sign which already contains the commission rates that drivers receive for various runs. Only two

24

by Express's ability to affect the drivers' profits by exerting control over the volume of customers, the prices charged to the customers, and the number and profitability of the runs assigned to the drivers.

For example, Express can increase its customer base through increasing its advertising, or through altering the prices it charges per run; the more runs that are available, the greater a driver's ability to profit. Similarly, the prices that Express charges its customers determine the amount of commission that drivers earn. Finally, Express's dispatchers control the assignment of runs to the drivers. While the dispatchers try to assign runs first to the nearest on-call operator who last received a run, the dispatchers' ability to make assignments is circumscribed by the location of the drivers and the priority of the delivery. In other words, drivers have limited control over the number of runs they receive because a driver's location at the

---

of the forty drivers who testified stated that they had negotiated a slightly higher commission than that contained in the standard contract. Moreover, "it is not what the [drivers] could have done that counts, but as a matter of economic reality what they actually do that is dispositive." Mr. W Fireworks, 814 F.2d at 1047. As a matter of economic reality, Express exerts substantial, if not exclusive, control over the commissions earned by its drivers. Finally, even were the drivers able to negotiate the amount of their commissions, this ability has a negligible effect on their actual profits in light of the fact that it is Express who controls the number and quality of the runs assigned to each driver. A higher percentage commission is meaningless if the drivers receive a limited number of runs to which this higher commission applies. The district court clearly erred in giving weight to this factor.

time contributes to whether that driver will be assigned a particular run.

Thus, Express, and not its drivers, controls the largest determinants of profit---customer volume, advertising, price, and the assignment of runs. In Pilgrim Equipment, Mr. W Fireworks, and Circle C. Investments, the employer's ability to control at least these first three factors outweighed, in the court's view, the workers' ability to control factors such as experience, efficiency, initiative, and hustle. While an increase in a driver's hours or efficiency could certainly have a positive impact on the amount of money he or she earns, even the most industrious and efficient driver will not be able to profit if the prices charged (and thus the commissions available) are not significant, if there are few runs available to assign the driver, or if the driver is not in the right place at the right time in order to be offered runs. Drivers lack control over these vital determinants of profit.

Moreover, although not mentioned by the district court in connection with its analysis of this factor, the drivers' risk of investment loss is small. For the most part, the only investment that the drivers make is in their own labor. See Mr. W Fireworks, 814 F.2d at 1050; Silent Woman, 585 F. Supp. at 451. As recognized by both the district court and the majority, the record indicates that the vast majority of drivers do not invest in vehicles for purposes of their jobs. Rather, they drive their own personal vehicles. Similarly, while Express requires them to bear the cost

26

of the equipment needed to perform their jobs by deducting from the drivers' paychecks the cost of certain equipment that it supplies to the drivers, such as uniforms, radios and pagers, biohazard bags, and dry ice, the deductions terminate once the drivers leave Express's employment and they return the equipment to Express. Thus, in comparison to true independent contractors, the workers do not make considerable capital investments subject to the risk of loss if the business fails. Instead, the drivers need only earn enough to pay their "rent" on their Express equipment and their automobile expenses. As discussed above, the largest determinants of whether the drivers will make enough to compensate for these expenses are customer volume, advertising (which affects customer volume), the prices charged (which affect both customer volume and the amount of commission received by the drivers), and the assignment of runs to drivers. Express controls all of these factors, and thus controls the drivers' ability to profit and the likelihood that they will suffer loss.

In crediting the district court's findings on this factor, the majority erred. The drivers' control over such factors as the number of hours they work, their experience,[4] and their efficiency

---

[4] The court in Mr. W Fireworks noted that experience is a quality that can enhance the commissions of all commissioned employees and of all employees earning gratuities. See 814 F.2d at 1050. Consequently, the ability to earn more with experience does not distinguish an independent contractor from an employee. The majority finds relevant the fact that the experienced drivers knew which runs were most profitable. However, this knowledge would be of little use to a driver who was not offered profitable

27

is not the type of control over profit that is the true mark of an independent contractor. See Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947); Silent Woman, 585 F. Supp. at 451. While industry, experience, and efficiency can and do impact profit, the work of Express's drivers more closely resembles "piecework than an enterprise that actually depend[s] for success upon the initiative, judgment or foresight of the typical independent contractor." Rutherford Food Corp., 331 U.S. at 730; see Silent Woman, 585 F. Supp. at 452. I would therefore find clearly erroneous the district court's conclusion that the drivers controlled their opportunity for profit or loss.

With three factors pointing toward a finding of employee status, and considering the totality of the circumstances, I would conclude that these drivers are in fact employees rather than independent contractors. As the courts have consistently held, the central question is whether the workers, as a matter of economic reality, are dependent for their livelihood on their relationship

---

runs. It is undisputed that the drivers had little control over which runs they were offered and could choose only to accept or reject the runs offered. Turning down an unprofitable run would be no guarantee that the driver would be in the right place to receive an offer for a more profitable run, or that the next run offered would be more profitable than the last. In fact, the record reveals that many drivers were reluctant to turn down runs for fear that the dispatchers would retaliate against them by not giving them good runs in the future. Moreover, because the number of runs available was limited, many drivers testified that they rarely turned down runs when offered. Therefore, knowing which runs are profitable has little impact on the drivers' ability to realize profit.

with their employer.  See Carrell v. Sunland Constr., Inc., 998 F.2d 330, 332 (5th Cir. 1993); Mr. W Fireworks, 814 F.2d at 1043; Robicheaux v. Radcliff Material, Inc., 697 F.2d 662, 666 (5th Cir. 1983); Silent Woman, 585 F. Supp. at 450; see also Rutherford Food Corp., 331 U.S. at 730 (determining whether a worker is an employee "does not depend on . . . isolated factors but rather upon the circumstances of the whole activity").  Express's drivers clearly depend for their livelihood on Express.  They are "not specialists called in to solve a special problem, but unskilled laborers who perform[] the essential, everyday chores of [Express's] operation." McLaughlin v. Seafood, Inc., 867 F.2d 875, 876-77 (5th Cir. 1989). They have invested little more than their labor and, unlike true independent contractors, they lack the ability to grow their business.

United States v. Silk, 331 U.S. 704 (1947), and its companion case, Harrison v. Greyvan Lines, Inc., are clearly distinguishable. In concluding that the driver-owners of coal trucks in Silk and moving vans in Greyvan Lines were independent contractors, the Supreme Court's analysis relied heavily on the drivers' investment in the business and the management skills they exercised.  It was the drivers' considerable investment, the risk of loss of that investment, and the drivers' management of others that properly placed the Silk and Greyvan Lines drivers in the category of independent entrepreneurs seeking a return on their risky investments.

29

> [W]e agree with the decisions below in <u>Silk</u> and <u>Greyvan</u> that where the arrangements leave the driver-owners so much responsibility for investment and management as here, they must be held to be independent contractors. These driver-owners are small businessmen. They own their own trucks. They hire their own helpers. In one instance they haul for a single business, in the other for any customer. The distinction, though important, is not controlling. It is the total situation, including the risk undertaken, the control exercised, the opportunity for profit from sound management, that marks these driver-owners as independent contractors.

<u>Id.</u> at 719. In comparison, Express's drivers have a much smaller investment at stake (the family Geo is a far cry from the coal-hauling trucks and moving vans at issue in <u>Silk</u> and <u>Greyvan Lines</u>), and, consequently, are subject to a much smaller risk of loss because they overwhelmingly do not use vehicles purchased for the purpose of becoming a driver. They do not hire their own assistants. They rarely, if ever, work for anyone other than Express. Therefore, they differ considerably from the drivers in <u>Silk</u> and <u>Greyvan Lines</u>. <u>Compare</u> <u>Tobin v. Anthony-Williams Mfg. Co.</u>, 196 F.2d 547, 549-50 (8th Cir. 1952) (distinguishing <u>Silk</u>, court found truck drivers who hauled lumber were employees rather than independent contractors where truck drivers did not have substantial investment in trucks, and amount they could earn was largely within control of defendant) <u>with</u> <u>Goldberg v. Bellotto</u>, 207 F. Supp. 499, 500 (S.D. Fla. 1962) (truckers, who supplied their own tractors and, occasionally, trailers, hired their own assistants, and were authorized to solicit business for defendant, were independent contractors). Express's drivers are more accurately described as employees dependent for their livelihoods

30

on their employer, and I would so hold and order the district court to grant the requested injunctive relief.