**BRUECHER FOUNDATION SERVICES, INC., Plaintiff–Appellant**

v.

**UNITED STATES of America, Defendant–Appellee.**

No. 09–50312.

United States Court of Appeals, Fifth Circuit.

June 18, 2010.

---

* Pursuant to 5TH CIR R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Erwin S. McGee, Law Office of Erwin McGee, Austin, TX, for Plaintiff–Appellant.

Andrew M. Weiner, U.S. Department of Justice, Washington, DC, Cynthia E. Messersmith, U.S. Department of Justice, Dallas, TX, for Defendant–Appellee.

Before DeMOSS, ELROD, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge: *

Taxpayer Bruecher Foundation Services, Inc. ("BFS"), appeals from the district court's judgment in favor of the United States following a bench trial on BFS's tax liability. We find no error in the district court's conclusions of law and thus AFFIRM.

## I. Facts & Procedural History

This appeal arises out of a dispute between the United States and BFS over whether the workers whom BFS used in its foundation repair, grading, and land-

---

scaping services in 1999 and 2000 were independent contractors or employees of BFS.

Bruecher Foundation Services, Inc., is a corporation wholly owned by its president, William Howie Bruecher. BFS's business consists primarily of residential foundation repair and grading projects. In its tax filings, BFS recognizes two employees: Mr. Bruecher and a secretary. In those filings, BFS treats the workers who perform the manual labor involved in the foundation repair as independent contractors.

In 2002, the Internal Revenue Service ("IRS") conducted a general audit of BFS. The audit identified a discrepancy in BFS's filings for the tax years ending March 31, 2000 and March 31, 1999: BFS had claimed substantial deductions for "contract labor" on its Form 1120 income tax returns but had not filed any corresponding Form 1099s evidencing payments made to particular contractors. The IRS auditor referred the matter to the employment tax group, which commenced an employment tax audit of BFS.

The IRS did not notify BFS that it was conducting an employment tax audit. The IRS did not provide BFS with notice of the statutory worker classification safe harbor as it was required to do by law. *See* Small Business Job Protection Act of 1996, Pub.L. No. 104–188, § 1122(a), 110 Stat. 1755, 1766 (amending Revenue Act of 1978, § 530, Pub.L. No. 95–600, 92 Stat. 2763, 2885–86). Nevertheless, the IRS issued its Form 4666 Summary of Employment Tax Audit to BFS on July 2, 2003, identifying sixteen workers for tax year 2000 and thirteen workers for tax year 1999 whom the IRS had concluded through its audit were employees of BFS that BFS had improperly classified as independent con-

tractors. The audit summary also apprised BFS of the IRS's conclusion that BFS was not entitled to the statutory safe harbor provided by section 530 of the Revenue Act of 1978, as amended, because BFS had failed to file Form 1099s for the workers at issue.

The principal consequence of the reclassification of these workers was to create, in the IRS's determination, an obligation on BFS's part to have paid taxes on the workers' wages under the Federal Unemployment Tax Act ("FUTA"), 26 U.S.C. §§ 3301–3311, and the Federal Insurance Contributions Act ("FICA"), 26 U.S.C. §§ 3101–3128; *see* 26 U.S.C. §§ 3301 (imposing FUTA tax), § 3111 (imposing FICA tax); to have withheld and remitted, or have paid, the workers' FICA taxes, *see* 26 U.S.C. § 3102; and to have withheld and remitted specified amounts of the workers' anticipated federal income taxes, *see* 26 U.S.C. § 3402. Specifically, the IRS calculated, following the employment tax audit, that BFS owed $7,524.73 in FUTA taxes and $38,403.50 in FICA taxes and employee withholding for tax years 1999 and 2000.[1] Collectively, we refer to these obligations as BFS's "employment taxes."

The Form 4666 audit summary notified BFS of the IRS's calculation of these amounts due and offered BFS the opportunity to agree to the imposition of the tax liability as calculated by the IRS. BFS did not agree to the assessment.

In December of 2004, the IRS Appeals Office issued a Notice of Determination to BFS reiterating the audit's findings and apprising BFS of its right to appeal the worker classification determination to the United States Tax Court within 90 days pursuant to 26 U.S.C. § 7436. BFS did not appeal.

---

1. Pursuant to 26 U.S.C. § 6672(a), this amount included a 100% penalty for failing to withhold and pay over to the IRS the employees' portion of their FICA taxes.

On June 6, 2005, the IRS formally assessed additional employment taxes, penalties, and interest against BFS for tax years 1999 and 2000. On July 1, 2005, BFS paid the taxes and withholding due for fiscal years 1999 and 2000 for two employees—totaling $1,385.74—under the divisible tax rule.[2] On the same day, BFS submitted an administrative claim to the IRS for refund of taxes paid and abatement of taxes assessed. In its administrative claims, BFS argued that it was entitled to refunds and abatements of the employment taxes in dispute solely on the grounds that the workers at issue were independent contractors and not employees. The IRS rejected BFS's claims on the erroneous grounds that BFS had agreed to the assessment at the conclusion of the audit. BFS filed an "appeal" of this denial with the IRS on October 8, 2005; the appeal did not take issue with the IRS's incorrect statement that BFS had agreed to the assessment and again argued only that the workers at issue were independent contractors. The IRS issued a tax lien against BFS on December 13, 2005, and executed a levy against BFS's bank account on March 23, 2006.

On May 17, 2006, BFS filed Form 1099s for each of the workers in dispute for calendar years 1999 and 2000. Two days later, BFS filed this lawsuit in the United States District Court for the Western District of Texas. BFS sought a refund of the taxes it had already paid and an order abating any outstanding employment tax assessments for tax years 1999 and 2000.

After the United States answered the complaint, BFS moved for partial summary judgment on the grounds that it had complied with all aspects of the safe harbor provided by section 530 of the Revenue Act of 1978, as amended. The district court denied the motion. Thereafter, the United States counterclaimed for payment of taxes due and all statutory additions and moved for summary judgment. The district court did not rule on the United States' motion for summary judgment and held a bench trial on December 17 and 18, 2007. In February of 2009, the district court announced findings of fact and conclusions of law in favor of the United States on both the claim and counterclaim, ultimately concluding that the workers in dispute were BFS's employees. Judgment was entered on March 17, 2009, and amended, on the United States' motion, to reflect certain statutory additions to the judgment amount on April 3, 2009.

BFS timely appealed to this Court on April 15, 2009.

## II. Standard of Review

Our "standard of review for bench trials is well established: findings of fact are reviewed for clear error; legal issues, *de novo*." *Seal v. Knorpp,* 957 F.2d 1230, 1234 (5th Cir.1992). The district court's interpretation of section 530 is a question

---

**2.** Normally, a taxpayer may only challenge a tax debt in federal district court by making full payment of the amount due and suing for a refund. *See, e.g., Bowers v. United States,* 423 F.2d 1207, 1208 (5th Cir.1970) (explaining jurisdictional limitations of 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422(a)). The divisible tax rule allows a taxpayer to "pay a divisible portion of the tax ... and then test the validity of the entire assessment in a suit for refund brought ... in the District Court," *Lucia v. United States,* 474 F.2d 565, 576 (5th Cir.1973), provided that the tax in dispute is "divisible" in nature, *Flora v. United States,* 362 U.S. 145, 175 n. 38, 80 S.Ct. 630, 4 L.Ed.2d 623 (1960). The employment taxes at issue here are divisible taxes. *USLIFE Title Ins. Co. ex rel. Mathews v. Harbison,* 784 F.2d 1238, 1243 n. 6 (5th Cir.1986); *see also* 26 U.S.C. §§ 3111(a)–(b) (imposing FICA tax as excise tax), 3301 (imposing FUTA tax as excise tax); *Flora,* 362 U.S. at 175 n. 38, 80 S.Ct. 630 ("[E]xcise taxes may be divisible into a tax on each transaction or event....").

of law. *See Woodfield v. Bowman,* 193 F.3d 354, 358 (5th Cir.1999) ("Questions of law such as the interpretation of a statute . . . are subject to *de novo* review."). We have held that the district court's "determination of employee status is a finding of law subject to de novo consideration by" the court of appeals. *Breaux & Daigle, Inc. v. United States,* 900 F.2d 49, 51 (5th Cir.1990). However, the trial court's underlying factual determinations and inferences drawn from those determinations are reviewed only for clear error. *Brock v. Mr. W Fireworks, Inc.,* 814 F.2d 1042, 1044–45 (5th Cir.1987).

## III. Discussion

BFS challenges on appeal the district court's rulings on three serial issues related to its employment tax liability. First, BFS contends that the district court erred in concluding that BFS was not entitled to rely on the safe harbor provided by section 530 of the Revenue Act of 1978, as amended, to avoid liability for any misclassification of its employees. Second, BFS argues that, if it is not entitled to the section 530 safe harbor, then the district court should have assigned the burden of proof at trial to the United States because the IRS failed to comply with the advance-notice procedures of section 530. Third, failing other grounds for reversal, BFS disputes the district court's ultimate conclusion that BFS's workers were its employees and not independent contractors.

We find no reversible error in the district court's resolution of each of these three issues.

## A. The Section 530 Safe Harbor

The section 530 safe harbor provides employers with protection from employment tax assessments resulting from the good-faith misclassification of employees as independent contractors provided that employers meet certain requirements, including the filing of all required tax and information returns with the IRS. The United States argues that BFS cannot avail itself of the safe harbor because it did not file its Form 1099 returns for the workers in dispute here until two days before filing this refund action in federal district court—after the IRS had assessed the tax, denied BFS's administrative claims for refund and abatement, and begun collection enforcement. BFS argues that the statutory language imposes no time deadline by which to file the returns and that any IRS interpretation to the contrary does not deserve the court's deference.

The safe harbor provision at issue, codified as a note to 26 U.S.C. § 3401, was originally enacted as section 530 of the Revenue Act of 1978, and has been amended on several occasions thereafter.[3] Notwithstanding these amendments, it remains referred to as "section 530" following the numbering of the original enacting law. Section 530 provides that, for purposes of employment taxes, if a taxpayer characterizes a worker as an independent contractor, then the IRS may not reclassify that individual as an employee if the

---

**3.** Specifically, section 530 was substantively amended by section 269(c) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub.L. No. 97–248, 96 Stat. 324, 552 (making section 530, originally a temporary provision, permanent); section 1706(a) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085, 2781 (excepting engineers and computer programmers); and section 1122 of the Small Business Job Protection Act of 1996, Pub.L. No. 104–188, 110 Stat. 1755, 1766–68 (adding the advance notice requirement and assigning burden of proof). After the tax years in dispute here, section 530 was amended in respects not relevant to this appeal by section 864 of the Pension Protection Act of 2006, Pub.L. No. 108–280, 120 Stat. 780, 1024 (adding new subsection (f)).

taxpayer: (1) "did not treat [that] individual as an employee for any period" on the taxpayer's tax or information returns; (2) filed "all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to such individual for such period ... on a basis consistent with the taxpayer's treatment of such individual as not being an employee"; and (3) had a "reasonable basis for not treating such individual as an employee." § 530(a)(1). The dispute between the parties here focuses exclusively on the second element: whether BFS filed "all Federal tax returns (including information returns) required to be filed by the taxpayer with respect to" the disputed workers. The United States argues that BFS's late and strategic filing of its Form 1099s for the disputed workers cannot satisfy this requirement; BFS argues that there is no time limit on when it could file the forms and become eligible for section 530 protection.

As an initial matter, BFS does not dispute that, if the workers were independent contractors, it was required to file Form 1099–MISC for each worker to whom it paid more than $600 in a calendar year by February 28 of the following year absent an extension. *See* 26 U.S.C. § 6041(a) (requiring filing of information return); Treas. Reg. § 1.6041–6 (as amended in 2000) (setting filing deadline); 26 U.S.C. § 6081(a) (authorizing extensions). BFS thus concedes that it should have filed Form 1099s for these workers and that the Form 1099 filings it did make were more than five years late.

The United States would have us resolve this case by reference to the IRS's administrative practice in this area, *see* Rev. Rul. 81–224, 1981–2 C.B. 197; Rev. Proc. 85–18, 1985–1 C.B. 518, and the legislative history of the various enactments that together comprise section 530, *see, e.g.,* S.REP. No. 95–1263, 1978 U.S.C.C.A.N. 6761, *reprinted in* 1978–3 C.B. 321, 1978 IRB LEXIS 2279, at *436. At the outer boundaries of its argument, the United States would have us hold that a taxpayer's untimely filing of relevant informational returns *always* deprives that taxpayer of section 530 relief, no matter how minimal the lateness of the filing. By contrast, BFS argues that these administrative precedents are not entitled to deference and points us to other aspects of the legislative history and what it terms the plain language of the statute. BFS would have us hold that a taxpayer's untimely filing of the required returns *never* deprives the taxpayer of section 530 relief, so long as the returns are, at some point, filed. Both parties thus ultimately ask us to address the fundamental question of whether or not the section 530 safe harbor implicitly requires that Form 1099s be timely filed. The facts of this case, however, are not close. This is not a scenario in which a taxpayer arrived at 5:01 p.m. to find the office closed on the day the forms were due. Thus, we need not decide what would happen in such a case.

█ The timing issue here instead boils down to something much simpler—can BFS wait to file until after the challenged assessment is made and still make use of the "safe harbor?" Once viewed in this light, the answer is clear. We conclude that BFS cannot successfully raise the section 530 safe harbor in this action because BFS filed its Form 1099s *after* the IRS assessed the taxes in dispute here against BFS at the conclusion of the administrative process.

In *Mallette Brothers Construction Co. v. United States,* 695 F.2d 145, 155 (5th Cir. 1983), we explained that sovereign immunity applies with equal force to tax refund suits; and that, while the United States has consented to be sued in this context, it

has expressly conditioned its consent on the taxpayer's prior presentation of the claim for refund to the IRS for review. *See also* 26 U.S.C. § 7422(a) (requiring administrative exhaustion before suit). BFS obviously did not raise its claim of entitlement to the section 530 safe harbor during the administrative process that preceded the assessment of the taxes because, not having filed the requisite Form 1099s, it was plainly not entitled to that safe harbor at that time.

Normally, this failure to exhaust would present a jurisdictional bar. *Mallette Bros.*, 695 F.2d at 155–56; § 7422(a). However, where the United States raises a counterclaim for taxes due on exactly the same facts, federal jurisdiction over the taxpayer's claim pragmatically continues; the counterclaim presents no more than the inverse of the original claim, and a ruling on one implicitly resolves the other. *Gustin v. United States*, 876 F.2d 485, 489–90 (5th Cir.1989) (citing 28 U.S.C. § 1340 and 26 U.S.C. § 7402(a)). That jurisdiction exists, however, does not mean that BFS is permitted to raise for the first time in federal court a defense to taxation to which it was admittedly not entitled when the IRS assessed the taxes in dispute here.

The "assessment of tax" is the IRS's final determination of a deficiency at the end of its administrative process, *see generally* 26 U.S.C. § 6201 (authorizing and defining assessment of tax), and that action carries certain important consequences. One such consequence is that, in any subsequent proceeding, "whether . . . in Tax Court for redetermination of a deficiency or in district court upon a refund

claim or a government counterclaim," the assessment is presumed correct, and the burden rests with "the taxpayer . . . to prove by a preponderance of the evidence that the Commissioner's determination was erroneous." *Carson v. United States,* 560 F.2d 693, 695–96 (5th Cir.1977). The taxpayer does not satisfy this burden by proving that the IRS made a mistake in assessing the tax. Rather, "the taxpayer has the burden of showing that the assessment is wrong on any proper theory." *Bernstein v. Comm'r,* 267 F.2d 879, 881 (5th Cir.1959). We must therefore uphold the assessment here unless BFS can show that the deficiency—however arrived at—is wholly unsupportable. *See id.* ("It is immaterial whether the [IRS] proceeded upon a wrong theory in determining the deficiency. . . ."); *Carson,* 560 F.2d at 699 ("It is not enough . . . for the taxpayer to make an argument embarrassing to the IRS."). If there is, however, any legal basis for the assessment, even if it was not the one actually relied upon by the IRS, then the federal courts must enforce it.[4]

Here, BFS cannot meet its threshold burden of showing that the assessment was erroneous under section 530.[5] BFS concedes that it was not entitled to the protection of the section 530 safe harbor until it filed the relevant Form 1099s. At the time the tax was assessed, it had not done so. The assessment was therefore correct when made, and BFS cannot now complain in federal court of an "error" that the IRS did not make.

Thus, while we decline to address the question of whether section 530 requires the timely filing of the relevant Form 1099s to obtain the benefit of the safe

---

4. For this reason, the IRS's erroneous denial BFS's administrative claim on the grounds that BFS had agreed to the assessment is irrelevant.

5. Of course, the assessment could also be erroneous if the IRS incorrectly categorized BFS's workers as employees when they were in fact independent contractors. We address that issue in section III.C, *infra.*

harbor, we hold that the practical effect of waiting until after the conclusion of the IRS's administrative process and the concomitant assessment of the tax is to preclude BFS from successfully raising section 530 as a defense in this subsequent judicial proceeding.

## B. Burden of Proof

█ BFS argued before the district court and argues on appeal that the IRS's admitted failure to comply with the section 530(e)(1) notice procedures reverses the usual burden of proof to put the burden on the United States. BFS conceded at oral argument that there is no authority for this proposition in the statute or in the case law and asks us to create this remedy wholesale. We decline to do so. *Cf., e.g., United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("We have long recognized that 'many statutory requisitions intended for the guide of officers in the conduct of business devolved upon them . . . do not limit their power or render its exercise in disregard of the requisitions ineffectual.' . . . [I]f a statute does not specify a consequence for [the government's] noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction." (quoting *French v. Edwards*, 80 U.S. (13 Wall.) 506, 511, 20 L.Ed. 702 (1871))); *Brock v. Pierce County*, 476 U.S. 253, 260, 265–66, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (declining to impose a consequence for the Secretary of Labor's failure to comply with a statutory deadline absent express Congressional specification of a remedy).

We do not mean to suggest that there can never be a remedy for the IRS's failure to comply with section 530(e)(1). The resolution might, for example, be different if BFS asserted a violation of its due process rights stemming from the failure to provide notice. *See, e.g., Nu–Look Design, Inc. v. Comm'r*, 356 F.3d 290, 294 n. 1 (3d Cir.2004) (rejecting due process claim on the grounds that constitutionally-sufficient notice was eventually given by the Notice of Determination). But that is not the case here; as in *Nu–Look Design*, BFS was apprised of the IRS's determination as to the non-applicability of the section 530 safe harbor at the conclusion of the audit, allowing BFS ample opportunity for administrative relief on those grounds.

In summary, the district court was correct in finding no basis for reversing of the burden of proof as a remedy for the IRS's failure to provide the section 530(e)(1) notice.

## C. Classification of BFS's Workers

█ The final issue presented by BFS's appeal is the ultimate question of whether BFS's workers were its employees for purposes of federal tax law. As the IRS is precluded by section 530(b) from issuing regulatory guidance on this point, the court's guidance on this question of law derives from federal decisional law. Applying the district court's findings of fact to the legal standards articulated by our precedent, we agree with the district court that the workers in dispute here were BFS's employees. We note here that this opinion addresses only the particular and perhaps peculiar facts of this case. We do not opine whether all construction workers are employees or independent contractors. We do not see this case presenting the nationwide, far-reaching implications threatened by Bruecher. If the facts were different, the result might be different—no more and no less.

In *Breaux & Daigle, Inc. v. United States*, we explained that the Supreme Court in *United States v. Silk*, 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947)

identified several factors we should consider in determining whether a worker is an employee or an independent contractor for [employment] tax purposes: degree of control, opportunities for profit or loss, investment in facilities, permanency of relation, and skill required in the claimed independent operation. No one factor is controlling nor is the list exclusive. *See also* RESTATEMENT (SECOND) OF AGENCY § 220; *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308 (5th Cir.1976) (same factors used to determine employee status for purposes of the Fair Labor Standards Act). Although the determination of employee status is to be made by common law concepts, a realistic interpretation of the term "employee" should be adopted, and doubtful questions should be resolved in favor of employment in order to accomplish the remedial purposes of the legislation involved. *Tex. Carbonate Co. v. Phinney*, 307 F.2d 289, 292 (5th Cir. 1962).

900 F.2d 49, 51–52 (5th Cir.1990) (footnote omitted). The court has also considered "critically significant ... whether the individual [worker] ... is in business for himself." *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1327–28 (5th Cir.1985) (quotations and footnote omitted).

The standard of review of the district court's assessment of these factors is in part de novo and in part for clear error only. *Breaux & Daigle*, 900 F.2d at 51. We explained in *Brock v. Mr. W. Fireworks, Inc.* that

> [t]here are thus three types of findings involved in determining whether [a worker] is an employee.... First, there are historical findings of fact that underlie a finding as to one of the five *Silk* factors; for example, whether [the purported employer] controlled the number of hours that an operator must be at a stand. It is beyond cavil, and neither of the parties dispute, that these findings of historical fact are subject to the clearly erroneous rule of Federal Rule of Civil Procedure 52(a).
>
> Second, there are those findings as to the *Silk* factors themselves.... Findings as to control, investment, skill and initiative, opportunity for profit and loss, and permanency are plainly and simply based on inferences from facts and thus are questions of fact that we may set aside only if clearly erroneous....
>
> The district court's analysis, of course, is subject to plenary review by this court, to ensure that the district court's understanding of the law is proper.
>
> Finally, the district court must reach an ultimate conclusion that the workers at issue are "employees" or "independent contractors." ... The ultimate finding as to employee status is not simply a factual inference drawn from historical facts, but more accurately is a legal conclusion based on factual inferences drawn from historical facts. We thus have held repeatedly that the ultimate determination of employee status is a finding of law subject to *de novo* consideration by this court.

814 F.2d 1042, 1044–45 (5th Cir.1987) (citations omitted).

We thus review the district court's findings on each factor for clear error only but its conclusion from those findings de novo. The district court's findings as to each of the factors are well supported by the factual record and we cannot conclude that they are in any respect clearly erroneous. We therefore recite here the relevant findings of fact made by the district court as to each factor we must consider, but offer our own de novo analysis as to the final weighing of those factors. In so doing, we emphasize the heavily fact-dependent nature

of this inquiry. The net outcome of the weighing of the factors that our precedent directs us to consider here depends on the precise combination of all the facts presented by this case. No single one of the facts we set out here—nor, indeed, even any subset of these facts—should be seen as determinative.

### 1. Degree of Control

As to the degree of control exercised by BFS over the workers, the district court found that BFS's

> [w]orkers did not always come to work in the morning[,] and they did not always call Bruecher to alert him to their absence. Workers worked for varying periods of time, and no evidence shows [BFS] ever penalized workers for not showing up in the morning, or for leaving for periods of time.... While the workers were on a job site, they were free to determine when to take breaks or when to eat lunch. For most of the day, Bruecher did not supervise workers' activities, and workers were able to follow their own pattern of work throughout the day.

However, BFS also

> had the right to instruct workers when, where, and how to work, and to some extent mandated the sequence of work. Specifically, Bruecher told the workers when to work at certain job sites, showed workers where the jobs were located, flagged the jobs, left the workers to progress at the job, and returned for the final leveling. Although Bruecher was not physically presented during most of the work day, ... he stopped by occasionally. If workers left a job site in disarray, Bruecher instructed them to stay or return to clean it and often paid workers for that time. [BFS] assigned additional projects to workers when one job ended and another began....

> Bruecher ... could discharge a worker for not performing his work properly.

In summary, the district court found that BFS "retained a significant level of control over its workers' schedules and ability to perform foundation-repair jobs, and where it did not exercise such control, it retained the right to do so."

### 2. Opportunities for Profit or Loss

The district court found that BFS "paid workers by the hour at the end of the week, even if the job was not completed" and that BFS "would have been liable for any damage caused by workers, and ... provided the warranty to homeowners" for the work completed. In short, the district court expressly found that "[t]he workers could not profit or suffer a loss from their work with" BFS.

### 3. Investment in Facilities

The district court found that BFS

> provided all the tools and equipment necessary for the workers to perform a foundation-repair job. If a work crew needed supplies, Bruecher directed workers to purchase supplies at the store and paid for all supplies. [The] equipment and tools for a foundation-repair job cost between $3,000 and $3,500, and ... the profit from one foundation-repair job could pay for the necessary equipment and tools. Such initial investment was not de minimis, and no evidence showed workers possessed their own equipment and tools.

Briefly stated, the district court simply found that BFS's "workers did not invest in facilities."

### 4. Permanency of Relation

The district court found that "[s]ome workers did not have permanent or continuing relationships with" BFS, but that "[a] continuing relationship existed be-

tween [BFS] and certain [other] workers." Further, "[w]orkers were free to terminate their relationship with [BFS] at any time, and often did."

### 5. Skill Required

The district court found that "[p]erforming certain aspects of [BFS]'s work involved skill, such as experience with and knowledge of ram-jack safety, and understanding the proper positioning and methodology for constructing retaining walls." However, "some workers possessed no relevant skills when they began work with" BFS. "Because one of the workers' major tasks was digging holes below foundations, unskilled workers were able to work for [BFS] alongside more skilled workers."

### 6. Whether the Individual Workers Were in Business for Themselves

The district court found that, "[w]hen they worked for [BFS], workers did not offer their services to the public or run their own foundation-repair companies. No evidence showed that any [BFS] workers ever bid for or completed foundation-repair projects of their own. While workers worked for [BFS], they did not work for others."

We cannot say that these findings of fact are clearly erroneous and must therefore take them as the basis for our de novo assessment of whether BFS's workers were its employees. Weighing these facts as directed by our precedent and with a presumption in favor of employment, *see Brock v. Mr. W Fireworks*, 814 F.2d at 1045, we conclude that the workers in dispute here were BFS's employees. The workers had no risk of loss, virtually no investment in facilities, and were not in business for themselves; these factors clearly favor finding employment. The moderate degree of control and relatively low level of skill required only weakly sup-

port employment. The final factor—the degree of permanence of the relationship, which varied from worker to worker—favors neither employment nor independent contractor status on these facts. Viewing all these factors together, we therefore hold that the district court did not err in finding that the workers were BFS's employees for federal employment tax purposes.

### IV. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court in favor of the United States on both BFS's claim for refund and abatement and the United States' counterclaim for taxes due.